**In re JOHNS–MANVILLE
CORPORATION, et al.,
Debtors.**

**In re JOHNS–MANVILLE SALES
CORPORATION, Debtor.**

**Nos. 82 B 11656–82 B 11676.**

United States Bankruptcy Court,
S.D. New York.

Feb. 11, 1986.

Levin & Weintraub & Crames, New York City by Mitchel H. Perkiel, Edmund M. Emrich, for debtors.

Bailey & Williams, Dallas, Tex. by Joel Steed, for Carpenter Plastering Co.

Brill & Meisel, New York City by Peter A. Cross, for Joseph E. and Rita Kowalski.

Gilbert, Segall & Young, New York City by Elihu Inselbuch, for Committee of Asbestos-Related Litigants and/or Creditors.

## DECISION AND ORDER DENYING RELIEF FROM AUTOMATIC STAY

BURTON R. LIFLAND, Bankruptcy Judge.

Carpenter Plastering Co. ("Carpenter") and Joseph E. and Rita Kowalski ("Kowalski"), the moving parties, have brought two separate but related automatic stay motions before this court. Their legal focus is a relatively recent and controversial decision of the Court of Appeals for the Third Circuit. *See In re M. Frenville Co., Inc.,* 744 F.2d 332 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). The *Frenville* decision raises anew significant issues concerning the scope of § 362 (the automatic stay provision) of the Bankruptcy Reform Act of 1978 ("Code") and related restraints.

Additionally, the moving parties are advancing positions regarding property damage claims which have become familiar to this court but remain unpersuasive in view of this reorganization's central concern for the plight of the personal injuries suffered by the asbestos victims. Carpenter and Kowalski argue that their grievances against the debtor are unrelated to the asbestos "plague," and that therefore they should be free to pursue non-Title 11 remedies. This egocentric view fails to take into account that virtually *all* aggrieved interests, asbestos *non obstante,* are presently precluded from gaining partisan advantage in any measure over the debtors' pool of assets.

## THE MOVING PARTIES

Carpenter and Kowalski brought separate motions against Johns-Manville Sales Corp. ("J–M Sales"), one of the debtors in these proceedings, challenging the applicability of the automatic stay to their claims against J–M Sales. Carpenter, who is a third-party defendant in a Texas state court action, and Kowalski, who is a defendant in a California state court action, seek to proceed on claims in these state court actions against J–M Sales on indemnification or contribution theories. Both Carpenter and Kowalski contend that their

causes of action against J–M Sales arose postpetition and fall outside the scope of the automatic stay. They further argue that even if this court finds the stay applicable, it should modify the stay to allow Carpenter and Kowalski to proceed with their actions, or at least to engage in limited discovery to determine whether J–M Sales is self-insured or has any available insurance coverage.

J–M Sales opposes both Carpenter and Kowalski's motions and argues that the operation of the automatic stay prohibits Carpenter and Kowalski from proceeding in their state court actions against J–M Sales. Alternatively, J–M Sales argues that this court should impose a stay under § 105 of the Code. The Committee of Asbestos-Related Litigants and/or Creditors ("Asbestos Committee"), which represents plaintiffs with asbestos-related injuries, opposes the relief sought by Kowalski and supports the position taken by J–M Sales. Both motions raise substantially similar issues, and are discussed together below.

FACTS

On August 26, 1982, Johns-Manville Corporation and a number of its affiliates, including J–M Sales (collectively, "Manville" or "the debtors"), filed petitions for reorganization under Chapter 11 of the Code. The debtors have continued to manage and operate their respective businesses as debtors in possession pursuant to §§ 1107 and 1108 of the Code. Carpenter and Kowalski seek to proceed with postpetition actions against J–M Sales stemming from damages incurred in the prepetition use of Flex Board and Rescon, building materials manufactured and sold by J–M Sales.

### 1. Carpenter's Claim Against J–M Sales.

Prior to the filing of Manville's petition, Carpenter purchased and used Flex Board panels manufactured and supplied by J–M Sales. On January 6, 1979, Carpenter, acting as a subcontractor, entered into an agreement with a general contractor, Charter Building, Inc. ("Charter"), to supply Charter with wall panels in the construction of the Texas Credit Union Building, a building owned and operated by Members Mutual Insurance Co. ("Members"). On May 30, 1979, Carpenter began manufacturing these panels, which contained Flex Board; on October 1, 1979, Carpenter completed mounting the panels on the Texas Credit Union Building.

Carpenter's claim against J–M Sales arose from damages associated with the use of the Flex Boards. In a June 1, 1982 letter to Manville, Carpenter's counsel advised that "[s]evere problems have arisen in these panels on [*inter alia*, the Texas Credit Union Building]," and that Carpenter "has expended several thousands of dollars in repairing leaks to the Texas Credit Union Building." In this letter, Carpenter's counsel also stated:

[a]s you of course realize, the owner [Members] will look to the general contractor [Charter] and the general contractor will look to Carpenter [the subcontractor] on all three projects [one of which was the Texas Credit Union Building] for damages caused by the cracks in the panel which may include total replacement. *Carpenter Plastering will of course look to Johns Manville for all damages connected with the replacement of these cracked panels on all three buildings as well as monies already expended and to be expended for repair work in preventing any more water from entering these buildings.* (emphasis added).

Carpenter clearly evidenced its intent in June 1982 to hold J–M Sales responsible for any damages which it might suffer in connection with the wall panels. Lawsuits with other parties were obviously contemplated, and in an apparent effort to settle matters, Carpenter, Members, Charter and others entered into an Agreement Tolling Statute of Limitation ("Tolling Agreement") in 1982, and agreed not to file suits concerning construction of the Texas Credit Union Building until June 1, 1983. Any suits arising out of the problems associated with the Texas Credit Union Building were thus intentionally postponed. Manville re-

sponded to the Carpenter letter on June 15, 1982 and stated "we have directed our Fort Worth regional personnel to engage a consulting engineer to help analyze the problems on these projects." Manville also made reference to and acknowledged the "tolling agreement with respect to a statute of limitations in connection with at least one of these projects."

After the Tolling Agreement expired, Members commenced a state court action in Dallas County, Texas against Charter and others alleging that the panels were defective because they cracked and allowed water to enter the interior of the building causing extensive damage. *See The Members Mutual Insurance Co. v. Charter Builders, Inc., Select Insurance Co., Inc., and Caudill Rowlett Scott, Inc.,* No. 83–11351–H (Dallas County, Texas 1983). Carpenter was not directly sued by Members, but was made a party to the litigation as a result of a third party action filed by Charter on October 28, 1983. Carpenter now seeks to file a third party action for indemnity or contribution against J–M Sales, and claims damages resulting from defective Flex Boards provided by J–M Sales.

### 2. Kowalski's Claim Against J–M Sales.

Kowalski is the general partner of a partnership which was formed in July, 1972 for the purpose of building and developing a condominium complex known as La Costa Fairways ("La Costa") in La Costa, California. Kowalski contracted with J–M Sales to supply the general contractor on this project with Rescon for the construction of La Costa. The project was completed prior to the filing of Manville's petition.

On November 18, 1983, the La Costa Fairways Homeowners Association ("Homeowners Association") commenced an action in a California state court against Kowalski and others alleging, *inter alia,* defects in the materials used in the construction of La Costa. *See La Costa Fairways Homeowners Association v. Joseph E. Kowalski, Rita C. Kowalski et. al.,* No. 24191 (Super.Ct. of Calif., San Diego Co.,

1983). In particular, the Homeowners Association alleged that the Rescon used in construction was not of merchantable quality, was defective and had caused damage. The Homeowners Association also stated in their Second Amended Complaint that:

[f]rom the commencement of the development and construction of the subject property and subject buildings by defendants and each of them, until on or about October, 1980, defendant, Kowalski, had been paying for and/or repairing balcony/roof deck leaks; the plaintiff and individual unit owners had reported balcony/roof deck leaks to defendant, Kowalski, and defendant, Kowalski, had, over the said period of time, at its cost and expense, been paying for and/or repairing the balcony/roof deck leaks by patching or otherwise attempting to stop said leaks.

Kowalski incurred damages associated with the Rescon prior to the filing of the petition, and was aware that future damages would continue to be incurred. On October 30, 1984, Kowalski filed a cross-complaint against J–M Sales for indemnification and other relief. Ten days later on November 9, 1984, Kowalski filed the first of three proofs of claim in these proceedings, seeking $500,000 in damages. The first claim, designated Claim No. 17334, is premised on the total damages Kowalski allegedly will suffer as a result of the Rescon used in the construction of La Costa for which it seeks indemnification from J–M Sales. The two other proofs of claim, designated Claim Nos. 24903 and 25431, were filed on March 20 and June 24, 1985, respectively, each in the amount of $500,-000. These claims have been expunged on consent as being duplicative, leaving only Claim No. 17334.

Notwithstanding the proofs of claim filed by Kowalski, Kowalski seeks to proceed with its action against J–M Sales, contending that its claim is premised on postpetition events which render the automatic

stay inapplicable or require its modification.[1]

## CONTENTIONS OF THE PARTIES

Both Carpenter and Kowalski contend that they could not commence their respective third party actions against Manville until after Manville filed its Chapter 11 petitions, and therefore the automatic stay provisions of the Code are inapplicable and they should be allowed to proceed with their third party actions.[2] They also argue that even if their actions are stayed by § 362, the stay should be modified to allow them to proceed with their third party actions against J–M Sales so that they are not prejudiced by the absence of J–M Sales as a party. Carpenter and Kowalski further argue that at a minimum the stay should be modified to allow them to engage in limited discovery to ascertain the nature and extent of J–M Sales' available insurance coverage.

J–M Sales contends that the automatic stay applies because both Carpenter and Kowalski have claims stemming from pre-petition events and even evidenced a pre-petition knowledge of their potential claims. Indeed Carpenter had informed J–M Sales that it intended to proceed against J–M Sales on indemnification or contribution theories. J–M Sales further maintains that neither party has demonstrated sufficient cause for modifying the stay. With regard to the Carpenter claim, J–M Sales states that Manville is self-insured, and that limited discovery will not uncover any available insurance coverage.

With regard to the Kowalski claim, J–M Sales points out that any insurance available is also subject to the rights and interests of other creditors, including asbestos health victims. In addition, J–M Sales argues that if this court finds the stay inapplicable, it should impose a stay pursuant to § 105(a) of the Code because of the competing claims to the insurance proceeds. By allowing these two particular parties to proceed, J–M Sales argues that a dangerous precedent would be set whereby Manville's reorganization would be obstructed by the opening of flood gates to uncontrolled litigation by other similarly situated claimants.

The Asbestos Committee supports the position taken by J–M Sales regarding the Kowalski matter. It argues that any modification of the stay would give Kowalski an advantage over others who have claims against the same insurance based assets, and would interfere with and frustrate the Manville reorganization.

## ISSUES

The following issues are presented:

1) Whether the claims made by Carpenter and Kowalski against J–M Sales are subject to the automatic stay provisions of the Code; and

2) Alternatively, whether the court should impose a judicial stay pursuant to § 105(a) of the Code.[3]

For the reasons which follow, this court finds that the automatic stay applies and should not be modified. The motions made

---

1. Kowalski's initial filing of the cross-complaint on October 30, 1984, was in violation of the automatic stay which became effective on the filing of the Manville petitions on August 26, 1982. Kowalski claims that it was unaware that its cross-complaint was subject to the stay. Violations of the stay may be punished by contempt, but the parties have not addressed or pursued this issue; nor will the court do so *sua sponte*.

2. In its motion, Carpenter sought only to modify the stay, but in its brief and at oral argument, the applicability of the stay itself was challenged.

3. After oral argument on these motions, this court granted Carpenter and Kowalski the op-

portunity to engage in limited discovery to determine the existence of specific policies of insurance which cover the specific injuries allegedly suffered by the parties. Discovery was taken, and no policies were found that would allow J–M Sales to separately and discretely pursue the California and Texas state litigation without involving or diluting the recoverable proceeds of general insurance policies held by Manville. These policies, which constitute major Manville assets and are estimated at $600 million or more, are considered property of the estate pursuant to § 541 of the Code and are the subject of ongoing litigation in San Francisco, California.

by Carpenter and Kowalski are therefore denied.

DISCUSSION OF LAW

A. *The Automatic Stay of § 362 Prohibits Both Carpenter and Kowalski from Proceeding Against J–M Sales in Other Courts Without First Obtaining This Court's Permission.*

The filing of a petition under Chapter 11 of the Code operates pursuant to § 362(a) as an automatic stay of:

(1) the commencement or continuation including the issuance or employment of process, of a judicial, administrative or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; [and] ... (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.

This section is deemed "one of the fundamental debtor protections provided by the bankruptcy laws." H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), *reprinted in* U.S.Code Cong. & Ad.News 5963, 6296; S.Rep. No. 989, 95th Cong., 2d Sess. 54, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5840. In *Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47 (2d Cir.1976), *cert. denied,* 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540, *reh'g denied,* 430 U.S. 976, 97 S.Ct. 1670, 52 L.Ed.2d 372 (1977), the Second Circuit stated that the stay

is designed to prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts. The stay insures that the debtor's affairs will be centralized, initially in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another.

*Id.* at 55.[4]

■ The federal policy underlying the stay is the protection of the debtor's estate from the "chaos and the wasteful depletion resulting from multifold, uncoordinated and possibly conflicting litigation." *In re Frigitemp Corp.,* 8 B.R. 284, 289 (S.D.N.Y. 1981). The stay, which is self-executing, "provides the essential breathing room for a Chapter 11 debtor to restructure its affairs with its creditors and reorganize into a viable entity." *In re Baldwin-United Corp.,* 48 B.R. 901, 902 (Bankr.S.D.Ohio 1985). *See also* H.R.Rep. No. 595, 95th Cong., 1st Sess. 340–41 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6296–97; S.Rep. No. 989, 95th Cong., 2d Sess. 54–55, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5840–41. Actions on claims that were or could have been brought before the filing of a bankruptcy petition are automatically stayed, *N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 530, 104 S.Ct. 1188, 1198, 79 L.Ed.2d 482 (1984), unless the court orders otherwise. The pressure of litigation on the debtor is therefore relieved and orderly and equitable distribution of the debtor's assets among all creditors is facilitated. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6297.

■ Thus the automatic stay is a crucial Congressionally-mandated tool necessary to the larger goal of rendering a total disposition of all claims in a reorganization proceeding. Relief from the automatic stay may be sought under § 362(d),[5] but

---

**4.** The Second Circuit was specifically discussing Rule 11–44 of the Bankruptcy Act of 1898, the predecessor to the Code, but the same policy has been carried through in the Code in a more developed and expansive manner.

**5.** Section 362(d) provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from

the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property under subsection (a) of this section of such party in interest; or

(2) with respect to a stay of an act against property, if—

until such relief is granted, the stay remains in place and is effective nationwide without notice. *See Clay v. Johns-Manville Sales Corp.*, 722 F.2d 1289, 1290–91 (6th Cir.1983), *cert. denied sub nom. Raymark Industries, Inc. v. Clay*, —— U.S. ——, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984); *NLT Computer Services Corp. v. Capital Computer Systems, Inc.*, 755 F.2d 1253, 1258 (6th Cir.1985).

■ Carpenter and Kowalski do not challenge the operation and effect of the automatic stay, but argue that they "escape" the stay provision altogether because their claims allegedly could not have been brought before the filing of the Manville petition. The threshold determination thus becomes whether Carpenter and Kowalski have Code-recognized "claims". As long as a cause of action is a "claim" within the meaning of the Code, such a claim must be adjudicated under the reorganization umbrella, and the automatic stay applies.

1) *Carpenter and Kowalski Have Claims Within the Meaning of § 101(4) Which are Subject to the Automatic Stay.*

A "claim" is broadly defined by § 101(4)(A) as "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." The Bankruptcy Act of 1898 ("Act"), the predecessor to the Code, required claims to meet threshold requirements of provability and allowability before qualifying for any distribution from the bankruptcy estate. The Act did not specifically define a "claim," although § 63 of the Act provided that certain debts could be "proved and allowed against [the] estate." A debt was specifically defined in § 1(14) of the Act to "include any debt, demand, or claim provable in bankruptcy." The Act thus required an initial determination of the claim's provability. Section 63(a) interlocked with Section 57(d) of the Act which provided:

(A) the debtor does not have an equity in such property; and

*[c]laims which have been duly proved shall be allowed upon receipt by or upon presentation to the court,* unless objection to their allowance shall be made by parties in interest or unless their consideration be continued for cause by the court upon its own motion: *Provided, however,* that an unliquidated or contingent claim shall not be allowed unless liquidated or the amount thereof estimated in the manner and within the time directed by the court; and such claim shall not be allowed if the court shall determine that it is not capable of liquidation or of reasonable estimation or that such liquidation or estimation would unduly delay the administration of the estate or any proceeding under this title. (emphasis added).

Thus even if certain kinds of contingent and unliquidated claims were provable, a strong possibility existed that they would not be allowed if they were incapable of reasonable estimation or liquidation. *See In re Baldwin-United Corp.*, 55 B.R. 885, 13 B.C.D. 1083, 1090 (Bankr.S.D.Ohio 1985). Moreover, a claim disallowed under § 57d was in turn deemed unprovable under § 63(d) of the Act. *In re Cartridge Television, Inc.*, 535 F.2d 1388, 1390 (2d Cir.1976). However, even though the creditor was precluded from sharing in any distribution from the estate, his claim survived discharge. *Id.* As the court in *Baldwin-United* observed:

[b]ecause disallowed claims were not subject to discharge, a creditor holding such a claim might recover a greater portion of his claim from the debtor than creditors with allowed claims who were limited to a share of the distribution from the debtor's bankruptcy estate.

13 B.C.D. at 1090, 55 B.R. 885. *See also* Matthews, *The Scope of Claims Under the Bankruptcy Code (First Installment)*, 57 Am.Bankr.L.J. 221, 223–38 (1983).

The Code has eliminated the concepts of provability and allowability in favor of a more expansive definition. The legislative

(B) such property is not necessary to an effective reorganization.

history of § 101(4) of the Code demonstrates that Congress intended the "broadest possible definition" for the term "claim" precisely so that *"all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case."* H.R. Rep. No. 595, 95th Cong., 1st Sess. 309 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6266; S.Rep. No. 989, 95th Cong., 2d Sess. 22, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5808 (emphasis added).

Cases interpreting § 101(4) almost without exception state that the term claim must be expansively defined. In *In re Robinson,* 776 F.2d 30 (2d Cir.1985), the Second Circuit, citing a compendium of caselaw, characterized the scope of the term claim as being:

> *inter alia,* "broad," *Ohio v. Kovacs* [—— U.S. ——] 105 S.Ct. 705, 709 [83 L.Ed.2d 649] (1985); "very broad," *In re M. Frenville Co., Inc.,* 744 F.2d 332, 336 (3d Cir.1984), *cert. denied* [—— U.S. ——] 105 S.Ct. 911 [83 L.Ed.2d 925] (1985); "extremely broad [ ]," *In re Kennise Diversified Corp.,* 34 B.R. 237, 244 n. 6 (Bankr.S.D.N.Y.1983); "could not be broader," *In re Thomas,* 12 B.R. 432, 433 (Bankr.S.D.Iowa 1981); "broadest possible," *Kallen v. Litas,* 47 B.R. 977, 982 (N.D.Ill.1985); *In re Vasu Fabrics, Inc.,* 39 B.R. 513, 517 (Bankr.S.D.N.Y.1984); *In re Johns-Manville Corp.,* 36 B.R. 743, 754 n. 6 (Bankr.S.D.N.Y.1984); "all-encompassing," *In re Baldwin-United Corp.,* 48 B.R. 901, 903 (Bankr.S.D.Ohio 1985); *In re Barnett,* 42 B.R. 254, 257 (Bankr.S.D.N.Y.1984); and "sufficiently broad to cover any possible obligation," *In re Smith Jones, Inc.,* 26 B.R. 289, 293. (Bankr.D.Minn.1982).

*Id.* at 35. The Second Circuit further stated that this wide reaching definition was "intend[ed] [so] that virtually all obligations to pay money [would] be amenable to treatment in bankruptcy proceedings." *Id.* at 34.

Moreover, to insure that all claims, however remote, are addressed in the bank-

ruptcy proceeding, Congress provided an estimation process in § 502(c)(1) of the Code for "any contingent or unliquidated claim, the fixing or liquidation of which as the case may be, would unduly delay the administration of the case". As recognized by the court in Baldwin-United:

> [t]he combined effect of § 101(4) and § 502(c) is to bring all claims of whatever nature into the bankruptcy estate, and to give all claimants the same opportunity to share in any distribution from the estate. No longer will some creditors enjoy a windfall or effectively be denied any recovery based upon the provability or allowability of their claims and the financial status of the debtor after bankruptcy. Equally important, Congress has insured that the debtor will receive a complete discharge of his debts and a real fresh start, without the threat of lingering claims "riding through" the bankruptcy.

13 B.C.D. at 1090, 55 B.R. 885.

Sections 101(4)(A), 362(a) and 502(c)(1) are intertwining provisions which lay the foundation for the bankruptcy court to deal comprehensively with all facets of the reorganization. Without this broad reaching base, piecemeal litigation would result in courts throughout the country and would seriously threaten or jeopardize a debtor's ability to reorganize. The drafters of the Code clearly did not intend such a result.

■ Carpenter and Kowalski's arguments that their claims against J–M Sales arose after Manville filed its petition may have superficial appeal, but they do not withstand close scrutiny. Congress plainly did not intend the mere postpetition service of a summons and complaint giving rise to a defendant's right to implead a debtor on a contribution or indemnification theory to render that third-party claim outside the scope of § 362(a).

■ Damages which are considered unmatured, unliquidated and contingent, clearly fall within the definition of a claim. In *In re All Media Properties, Inc.,* 5 B.R. 126 (Bankr.S.D.Tex.1980), *aff'd,* 646 F.2d

193 (5th Cir.1981), the court stated that "claims are contingent as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event." *Id.* at 133. At this juncture Carpenter and Kowalski's claims are contingent and unliquidated because there has been no determination yet in the state court actions on their possible liability. J.M. Sales would be liable for Carpenter and Kowalski's damages, or a portion thereof, only if the state courts find that Carpenter and Kowalski have incurred liability and are entitled to indemnity or contribution. The legal obligations of J–M Sales "no matter how remote or contingent" are to be dealt with in the bankruptcy case. H.R.Rep. No. 595, 95th Cong., 1st Sess. 309 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6266; S.Rep. No. 989, 95th Cong., 2d Sess. 22, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5808. Carpenter and Kowalski have claims within the meaning of § 101(4)(A).

■ Indeed, Carpenter, prior to Manville's filing, evidenced its awareness of the scope, source and nature of its cause of action against J–M Sales. In a prepetition letter to J–M Sales, Carpenter stated that it would "look to Johns-Manville for all damages connected with the replacement of the[ ] cracked [Flex Board] panels on all three buildings *as well as monies already expended and to be expended* for repair work in preventing any more water from entering these buildings." Letter, June 2, 1982, at 2 (emphasis added). Carpenter claimed that it was entitled to a right of payment from J–M Sales on an indemnity or contribution theory. Carpenter further recognized the ripeness of its cause of action and the likelihood of impending litigation, when it entered into the Tolling Agreement with other parties and agreed to delay bringing any suit involving the defective wall panels which it was otherwise entitled to institute. Carpenter cannot be allowed to transform what would otherwise be a *prepetition* claim into a *postpetition* claim by relying on a Tolling Agreement which it previously entered into.

■ Similarly, Kowalski incurred prepetition damages in making repairs to a building which had been constructed with Rescon supplied by J–M Sales. Kowalski knew the source and nature of its damages and filed a proof of claim in these proceedings for those damages both incurred and anticipated. By filing this claim for damages arising from prepetition events, Kowalski admits that its claim falls within the ambit of these reorganization proceedings. Nevertheless, shortly after filing its claim, Kowalski also instituted a state court action seeking to recover precisely those damages sought in the proof of claim. Kowalski cannot be allowed to simultaneously pursue its claim in two separate fora namely the California state court and the federal bankruptcy court.

2) *In re M. Frenville Co., Inc., 744 F.2d 332 (3d Cir.1984) Does Not Support Carpenter and Kowalski's Arguments that the Automatic Stay is Inapplicable to Their Claims.*

Carpenter and Kowalski argue that *In re M. Frenville Co., Inc.*, 744 F.2d 332 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985) is dispositive of their cases and supports the position that their claims fall outside the sphere of the automatic stay. This court disagrees. Not only are the facts of this case distinguishable from those in *Frenville,* but *Frenville* with a strained, narrow analysis limits by judicial fiat a broad, legislatively-mandated definition of the term "claim."

In *Frenville,* an accounting firm which had prepared prepetition financial statements for the Chapter 7 debtors was sued after the debtors' petition had been filed by several of the debtors' creditors who alleged that the statements were negligently and recklessly prepared. The creditors claimed damages for resulting losses. The defendant-accounting firm sought to implead the debtors as third party defendants for purposes of obtaining indemnification or contribution for any losses suffered as a

result of the creditors' suit. The bankruptcy judge held the automatic stay applicable because the debtors liability, if any, stemmed from prepetition acts, and refused to grant relief from the stay. The district court affirmed, but the Third Circuit reversed.

The Third Circuit, albeit recognizing the broad definition accorded the term "claim," focused on the "right to payment" portion of the § 101(4)(A) definition and found the crucial issue to be when the right to payment arose. "While federal law controls which claims are cognizable under the Code, the threshold question of when a right to payment arises, absent overriding federal law, 'is to be determined by reference to state law.'" 744 F.2d at 337 (citing *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946), *reh'g denied,* 329 U.S. 833, 67 S.Ct. 497, 91 L.Ed. 706 (1947)). In an accompanying footnote, the Third Circuit recognized that

> [i]f there were some overriding federal policy, we might have the power to develop federal law. *See In re Beck Indus., Inc.,* 725 F.2d 880, 891 (2d Cir.1984); *In re Johns-Manville Corp.,* 36 B.R. 743, 751 n. 4 (Bankr.S.D.N.Y.1984), *appeal denied,* 39 B.R. 234 (S.D.N.Y.1984). A bankruptcy proceeding stemming from a mass tort—such as exposure to asbestos—may be a case in which the application of federal law is indicated.

*Id.* at 377 n. 8. In *Frenville,* no overriding federal policy was found to exist and the court looked in its absence to state law. Applying New York law, the Third Circuit decided that a claim or cause of action premised on indemnity or contribution did not arise until a suit had been instituted by the plaintiff and an answer submitted by the defendants. That event occurred postpetition and the Third Circuit thus found the automatic stay inapplicable. 744 F.2d at 335–36.

The Manville case is a bankruptcy proceeding stemming from a mass tort and, as contemplated by *Frenville,* the application of federal and not state law is warranted.

The instant proceedings are therefore factually distinguishable from the *Frenville* case. However, even if they were not so distinguishable, the state law analysis used by the Third Circuit in *Frenville* is inappropriate. It creates an artificial and arbitrary classification system by which the timing of a third-party lawsuit against the claimant determines not only the priority of distribution on a claim but also the dischargeability of the claim.

In *In re Baldwin-United Corp.,* 48 B.R. 901, 903 (Bankr.S.D.Ohio 1985), the court clearly displayed its dissatisfaction with the *Frenville* analysis and stated:

> [t]o the extent that *In re M. Frenville Co., Inc.,* 744 F.2d 332 (3d Cir 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), holds to the contrary, we find that decision fundamentally at odds with applicable precedents from the Sixth Circuit, and respectfully decline to follow it. Our disagreement with that decision flows from the Court's failure to distinguish between "claim" as defined in 11 U.S.C. § 101(4) and a cause of action for indemnity or contribution under state law. While the Third Circuit acknowledges the all-encompassing definition of "claim" under § 101(4), it nonetheless holds that the claim for indemnity or contribution arose at the same time that a cause of action arose.

*Id.* at 903. The court also noted that "the mere filing of a third-party suit for indemnity and contribution affects the assets of these Debtors, since such suits must inevitably add to the administrative costs of the estates with a concomitant decrease in proceeds available for distribution to creditors." *Id.* at 904.

In *In re Yanks,* 49 B.R. 56 (Bankr.S.D. Fla.1985), the court also declined to follow the *Frenville* decision. Like *In re Baldwin-United, Yanks* disagreed with "*Frenville'*s reliance upon state law to determine if a claim existed against the debtors at the time that the bankruptcy cases were commenced." *Id.* at 58. *Yanks* also challenged the Third Circuit's reliance upon *Vanston Bondholders Protective Commit-*

*tee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), for the proposition that the existence of a claim is determined by reference to state law, and it objected to the narrow definition the court accorded the term claim. *Yanks* found that "Frenville fails to consider fundamental bankruptcy policies." 49 B.R. at 58. The bankruptcy court further commented that the *Frenville* analysis would result in certain causes of action being accorded claim status on the sole basis of timing.

> To permit a claim to be discharged when creditors file a suit against a third party before a petition is filed and to prevent a claim from being discharged if those same creditors filed the same suit against the same third party after a petition is filed is simply inequitable.

*Id.* Adherence to *Frenville* would reinstitute the provability concept of claims, which the drafters of the Code specifically intended to abolish.

The *Frenville* analysis has been criticized by bankruptcy courts, and the Second Circuit has articulated its reservations about following the *Frenville* rationale. In *In re Baldwin-United Corp. Litigation,* 765 F.2d 343, 348 n. 4 (2d Cir.1985), the Second Circuit noted that "[w]e are not as sure as the District Court that, if we reached the issue, we would follow *Frenville* and hold the stay inapplicable to Paine-Webber's third party complaint. The broad definition of 'claim' in the Bankruptcy Code ... creates a substantial question whether the stay applies to the third-party complaint."

This court also chooses not to follow the *Frenville* rationale, because it ignores congressional intent to define "claim" broadly. To that extent it distorts the underlying policies of the Code in equating a claim with a cause of action for indemnity or contribution under state law notwithstanding the clear pre-petition rooting of the right to payment being sought. Adherence to *Frenville* would frustrate Congress' intent to channel claims concerns toward one forum and allow for a comprehensive plan of reorganization.

The Carpenter and Kowalski cases highlight the widespread misapplication of *Frenville* which the Third Circuit perhaps did not anticipate. Carpenter and Kowalski had a prepetition awareness of their claims for contribution or indemnification against J–M Sales and knew of pending litigation or at least anticipated it. Procedural and extraneous factors such as the timing of the filing of a summons and complaint by a third party, which is not associated with the underlying nature of the cause of action held by Carpenter and Kowalski, simply should not determine the existence or nonexistence of a "claim." Rather the focus should be on the time when the acts giving rise to the alleged liability were performed, which in the Carpenter and Kowalski cases occurred prepetition when J–M Sales provided the allegedly defective Flex Board and Rescon. Thus, for federal bankruptcy purposes, a prepetition "claim" may well encompass a cause of action that, under state law, was not cognizable until after the bankruptcy petition was filed. The analysis propounded by *Frenville* is therefore inappropriate. It permits parties to artificially juggle their existing substantive rights by deciding for themselves the best time to serve process.

B. *Alternatively, Section 105(a) of the Code Empowers This Court To Enjoin Carpenter and Kowalski From Proceeding Against J–M Sales.*

■ Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." This section allows the court the flexibility to fashion relief which "includes the authority to enjoin litigants from pursuing actions pending in other courts that threaten the integrity of a bankrupt's estate." *In re Davis,* 730 F.2d 176, 184 (5th Cir. 1984) (citations omitted). *In re Anje Jewelry Co., Inc.,* 47 B.R. 485 (Bankr.E.D.N.Y. 1983), the court found that "[i]t is under Section 105 that the bankruptcy court is granted the power to stay proceedings not covered by the automatic stay provisions of

11 U.S.C. § 362(a)" (citation omitted). *Id.* at 486. Section 105 has been construed fairly narrowly. Indeed, this court in discussing a possible application of § 105 in *In re Johns-Manville Corp.*, 26 B.R. 405, 414–15 (Bankr.S.D.N.Y.1983), *aff'd,* 40 B.R. 219 (S.D.N.Y.1984) found that:

> [a]lthough Section 105 may be used to extend the stay, Section 105 does not have a life of its own and this extension may only be accomplished within the proper boundaries of Section 362. That is, unless this extension is designed to protect the debtor's interests, it cannot be granted.

Recently, however, the Second Circuit has viewed the applicability and scope of § 105 in a less confining fashion. In *In re Baldwin-United Corp.*, the Second Circuit stated:

> [e]ven if it should ultimately be determined that the automatic stay under section 362 does not apply to [the] third-party complaint, *the Bankruptcy Court has authority under Section 105 broader than the automatic stay provisions of Section 362* and may use its equitable powers to assure the orderly conduct of the reorganization proceedings. *See Johns-Manville Corp. v. Asbestos Litigation Group (In re Johns-Manville Corp.), supra; In re Lake,* 11 B.R. 202 (Bkrtcy.S.D.Ohio 1981); 2 *Collier on Bankruptcy* ¶ 105.02 (15th ed. 1985).

765 F.2d at 348. This court has thus been legislatively equipped with the necessary authority to effectuate an orderly and efficient reorganization of debtors.

 Even if this court found that Carpenter and Kowalski do not have claims which are subject to the automatic stay, it would have the necessary authority under § 105(a) to impose a judicial stay preventing Carpenter and Kowalski from proceeding with their actions against J–M Sales. Any injunction issued would, however, have to meet the requirements of Fed.R. Civ.P. 65, *Spagnol Enterprises, Inc. v. Atlantic Financial Federal Savings Association,* 33 B.R. 129, 131 (D.Pa.1983). Stays or injunctions issued under § 105(a) will be granted only under the usual rules for the issuance of injunctions and are unlike a § 362(a) stay which goes into effect immediately upon the commencement of a case. The Second Circuit has set forth the following test:

> (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979); *United States v. Siemens Corp.,* 621 F.2d 499, 505 (2d Cir.1980); *Sperry International Trade, Inc. v. Government of Israel,* 670 F.2d 8, 11 (2d Cir.1982).

J–M Sales has amply demonstrated the irreparable harm it will suffer if the stay is lifted or modified, because the parties would then be able to proceed against Manville's insurance policies, which constitute a major asset of the Manville estate. *In re Johns-Manville Corp.,* 26 B.R. 420, 436–37 (Bankr.S.D.N.Y.1983), *aff'd,* 40 B.R. 219, 228–31 (S.D.N.Y.), *rev'd in part on other grounds,* 41 B.R. 926 (S.D.N.Y.1984); *In re Johns-Manville Corp.,* 33 B.R. 254 (Bankr. S.D.N.Y.1983), *aff'd,* 40 B.R. 219, 228–31 (S.D.N.Y.), *rev'd in part on other grounds,* 41 B.R. 926 (S.D.N.Y.1984). J–M Sales and the Asbestos Committee have shown that allowing Carpenter and Kowalski to either commence or continue their actions against J–M Sales would interfere with and frustrate the reorganization, especially in view of the prior findings in the Manville case. In *In re Johns-Manville Corp.,* 31 B.R. 965 (S.D.N.Y.1983), the court found that "the determination of [Manville's] rights under its insurance policies is of central importance to its estate, and to the ultimate prospects of proposing a plan for reorganization under Chapter 11." *Id.* at 974. The court held that the automatic stay applied to a declaratory judgment action brought by Manville's liability insurer against Manville, and concluded that:

> the resolution of [Manville's] relationships with its several insurers is of cen-

tral importance to the bankruptcy proceeding; that it is preferable to resolve all these issues in a single forum; and that piecemeal adjudication of these issues in different forums would be counterproductive for readily apparent reasons.

*Id.* at 975. The possibility of piecemeal litigation continues to threaten the fabric of the Manville reorganization and decreases the likelihood of Manville leaving this Chapter 11 proceeding a reorganized entity. Furthermore, any present dissipation of the insurance proceeds will greatly reduce the recoveries of the asbestos-health victims who have suffered substantial personal injuries. It would be grossly inequitable to allow Carpenter and Kowalski to proceed against Manville in preference to other creditors of these estates, especially the asbestos-health victims. The grim realities of the *Manville* case and the plight of the personal injury claimants underscore the need for this reorganization to move forward.

Notwithstanding the foregoing bases for denying Carpenter and Kowalski's motions, recent case authority construing claims similar to those of Carpenter and Kowalski suggest that under appropriate circumstances these claims may not be assertable at all. *See In re Baldwin-United Corp.,* 13 B.C.D. 1083, 55 B.R. 885 (Bankr.S.D.N.Y.1985) (dealing with objections to filed claims for indemnification and contribution and applying a claims estimation procedure). The court is not faced today with an objection to the claims filed by Carpenter and Kowalski, or for a request to estimate their claims, and therefore it need not at this time utilize the enforcing rationale elucidated in *Baldwin-United.*[6]

## CONCLUSION

For the reasons stated herein, this court denies the motions of Carpenter and Kow-

---

6. In *Baldwin-United Corp.,* 55 B.R. 885, 13 B.C.D. 1083 (Bankr.W.D.Ohio 1985), the debtor objected to certain brokers' claims for contribution and indemnification. The court disallowed these claims on several grounds. In discussing contribution, the court stated that "[b]y its very nature a claim for contribution [whether premised on tort or contract bases] presupposes a sharing of liability and thus a codebtor relationship." *Id.* at 1086, 55 B.R. 885. Then in estimating the claims involved, the court, quoting *Bittner v. Borne Chemical Co., Inc.,* 691 F.2d 134, 135 (3d Cir.1982), stated that:

> [s]ection 502(c) makes no mention of the procedure to be followed in estimating claims. The few cases interpreting this provision are in agreement that the bankruptcy court should use 'whatever method is best suited to the particular contingencies at issue.'

13 B.C.D. at 1091, 55 B.R. 885 (citing *Bittner v. Borne Chemical Co., Inc.,* 691 F.2d at 135). This approach logically supports the conclusion that estimated claims which become fixed at some post reorganization time have no reachback against the plan assets or the reorganized entity. *See In re Baldwin-United Corp.,* 13 B.C.D. at 1090, 55 B.R. 885 (lingering claims will not ride through the bankruptcy).

Peering further into the Code tapestry and, as provided for in Section 509(c) (claims of codebtors):

> [t]he court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or *for reimbursement or contribution, of an entity that is liable with the debtor on, or that has secured, such creditor's claim, until such creditor's claim is paid in full, either through payments under this title or otherwise.* (emphasis added).

The *Baldwin-United* court found that:

> The codebtor asserting a claim for contribution has no right to any distribution from the debtor's estate until the creditor's claim has been paid in full. Thus, if a codebtor has not paid the creditor and established his right to payment from the debtor as of the date of the ruling on the objection, his claim is contingent and must be disallowed under § 502(e)(1)(B).

13 B.C.D. at 1088, 55 B.R. 885. Section 502(e)(1)(B) reinforces this outcome and provides in pertinent part that:

> the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on ... the claim of a creditor, to the extent that such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution.

The combined effect of § 502(e)(1)(B) and 509(c) requires the codebtor to establish that an amount whether premised on contract or tort is due and owing to a creditor as a prerequisite to allowance of his claim. *Id.* at 1092, 55 B.R. 885. In applying the analysis of the *Baldwin-United* court, it would appear clear that claims for contribution advanced by co-debtors as well as direct claimants, and perhaps claims for indemnification, may depending on the particular circumstances be disallowed.

alski and holds the automatic stay applicable.

It is SO ORDERED.