### In re Wayne M. GROVE and Linda L. Grove, Debtors.

### No. 87–80508.

United States Bankruptcy Court, C.D. Illinois.

May 26, 1989.

Dean B. Rhoads, Peoria, Ill., for debtors.

Tim Swain, Peoria, Ill., Barry S. Rosen, Bruce W. Boyd, and Mark A. Kaprelian, Sachnoff & Weaver, Chicago, Ill., Catherine Ray Topping, Washington, D.C., for F.D.I.C.

Charles E. Covey, trustee Peoria, Ill.

U.S. trustee, Peoria, Ill.

## OPINION AND ORDER

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

The Debtor, WAYNE M. GROVE, was a director and officer of the State Bank of Cuba (Bank). His wife and co-debtor, LINDA L. GROVE, was a director of the Bank.[1] In February of 1986 a shareholder derivative action (Gibson Action) was filed in state court against the Debtors and other directors of the Bank. Count I was directed against Wayne, alleging that in acting as a loan officer he made imprudent loans and disregarded established principles of banking and the policies of the Bank which led the Bank to suffer losses. Count II is directed against both the Debtors and other directors of the Bank, alleg-

ing the directors failed to meet their responsibilities to the Bank which caused the Bank to suffer losses.

In July of 1986, the same plaintiffs who brought the Gibson Action filed a state court action against American Casualty, which had issued a directors' and officers' liability insurance policy, seeking a declaration that American Casualty was liable for all damages awarded in the Gibson Action, any related claims, defense fees and expenses as they are incurred in the Gibson Action, compensatory and punitive damages, and attorney's fees and costs in prosecuting the declaratory judgment action (American Action). Both actions were removed to the United States District Court.

Subsequently on January 9, 1987, the Federal Deposit Insurance Company (FDIC) was appointed receiver of the Bank and the FDIC in its corporate capacity acquired certain of the Bank's assets, including the Gibson Action. On March 6, 1987, the Debtors filed their Chapter 7 proceeding. On April 15, 1988 the FDIC in its corporate capacity was substituted as party plaintiff in the Gibson Action. On May 15, 1987, the district court ruled on American Casualty's motion to dismiss filed in the American Action, and held that until the Gibson Action was concluded and liability established that a cause of action could not be brought against American Casualty and that American Casualty had no responsibility to defend the Gibson Action. *Zaborac v. American Casualty Co. of Reading, Pa.,* 663 F.Supp. 330 (C.D.Ill.1987). On June 10, 1988, the FDIC filed in this Court its motion to modify the injunction arising from Debtors' discharge. In that motion the FDIC seeks to pursue the litigation against the Debtors so that if it is successful, it can proceed against American Casualty on the directors' and officers' liability policy. The FDIC, recognizing that the Debtors have been discharged, does not intend to seek enforcement of any judgment against the Debtors personally. The Debtors opposed the motion, primarily on the grounds that the Debtors would be required to defend in

---

**1.** Hereinafter the Debtors shall be jointly referred to as "Debtors" and individually as "Wayne" or "Linda".

the Gibson Action and incur costs for defense, including attorney fees.

In presenting their respective positions, both the FDIC and the Debtors have adopted an analysis based on Section 362 of the Bankruptcy Code, 11 U.S.C. Section 362, and urge the Court to employ a balancing test involving three considerations: [1] will any "great prejudice" be done to either the bankruptcy estate or the debtor from a continuation of the litigation; [2] does the hardship to the plaintiff in that litigation to the maintaining of the stay considerably outweigh the hardship to the debtor; and [3] does the plaintiff have a probability of prevailing on the merits. *In re Bock Laundry Mach. Co.*, 37 B.R. 564 (Bkrtcy.N.D.Ohio W.D.1984); *In re Winterland*, 101 B.R. 547, C.D.Ill., 1988, J. Lessen.

■ However, Section 362 is not the springboard for determining whether to permit the FDIC to proceed against the Debtors. The Debtors received their discharge on October 19, 1987. Upon discharge, the automatic stay of Section 362 terminated and was replaced by the permanent injunction of Section 524, 11 U.S.C. Section 524. *In re Mann*, 58 B.R. 953 (Bkrtcy.W.D.Va.1986). Therefore, the appropriate inquiry is the scope of Section 524. Section 524(a)(2) provides that a discharge

[O]perates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor....

Subsection (e) of Section 524 provides, however, that

Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

As the court noted in *In re Mann, supra,* courts have held that Section 524 does not prohibit the continuance of litigation against the debtor in order to permit an insurance recovery. In *In re Deever*, Case No. 185–00344 (June 11, 1986), this Court permitted a creditor, post discharge, to continue to pursue an uninsured motorist claim through arbitration/state court litigation against the debtor uninsured motorist.

Thus, a balancing test is inappropriate under Section 524(e). Section 524(a)(2) bars only actions to collect a debt as a personal liability of the debtor. By its very terms it does not bar all suits against the debtor. As the court in *Mann* noted:

The injunction is required only when continuance of the civil suit will result in efforts to collect a judgment award from the debtor or his property. However, as in [other cases] the state court action will not be continued to collect the judgment from the debtor personally. The sole purpose for maintaining the suit is to obtain a judgment establishing the uninsured motorist's liability. As in [other cases], establishing this liability is a prerequisite to any right to recover. Thereafter, [the creditor] will seek recovery under the provisions of uninsured motorist coverage with [her insurer.] The Debtor and his property are not subject to any risk and maintenance of the suit does not frustrate the policy of the Bankruptcy Code in giving the Debtor a fresh start in his economic life.

Permitting a creditor to pursue a personal injury lawsuit to recover insurance as long as the costs of defense were borne by the debtor's insured, the court, in *In re Lembke*, 93 B.R. 701 (Bkrtcy.N.D.1988), stated:

It makes no sense legally or equitably for an insurer to escape insurance coverage for injuries caused by its insured merely by the happenstance of the insured's bankruptcy discharge. Such a result would be fundamentally wrong.

In sum, the FDIC has the right to proceed with its action against the Debtors without balancing any prejudice between the Debtors and the FDIC. And that is rightly so, for if the FDIC is forced to try the Gibson Action without Wayne, who was the Bank's chief executive officer, the FDIC could be placed at a tactical disadvantage. The other defendants could point the finger of blame at him. If this tactic

would be successful, the FDIC would lose the potential benefit of $1,000,000.00 of insurance coverage because the other defendants would be exonerated by blaming Wayne, and the FDIC could not recover against him.

The question before the Court involves whether the pursuit of the Gibson Action by the FDIC adversely affects the Debtors' fresh start. The Debtors should not be exposed to any liability for pre-petition claims. As previously noted, the FDIC is not seeking to impose any personal liability on the Debtors. However, the Debtors contend that although the FDIC does not seek to impose personal liability, such could arise as the insurance policy requires them to defend any action brought against them. So if they fail to defend, they would be liable to American Casualty for any amounts which it is required to pay.

The Debtors' first contention is based on the inaccurate premise that a failure to defend the Gibson Action creates a post-petition liability. Section 101(4) of the Bankruptcy Code defines "claim" to mean

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured;

11 U.S.C. Section 101(4). The Bankruptcy Code uses the broadest possible definition of a claim. *Kallen v. Litas*, 47 B.R. 977 (N.D.Ill.1985). Even claims which are unmatured, unliquidated or contingent are clearly included in the definition of a claim. *In re Johns–Manville Corp.*, 57 B.R. 680 (Bkrtcy.S.D.N.Y.1986). In *In re Amfesco Industries, Inc.*, 81 B.R. 777 (Bkrtcy.E.D. N.Y.1988), a case most similar to the present one, the directors of the debtor, threatened with suit by one of the debtor's unsecured creditors, brought an action against the debtor for legal expenses pursuant to an indemnification agreement.[2] Discussing whether the directors had a

claim against the debtor for the legal fees, the court stated:

Contingent means 'likely but not certain to happen.' *Webster's New Collegiate Dictionary* 243 (1979)....

Therefore, even though some of the elements necessary to constitute a cause of action have yet to occur, a 'claim' may exist under federal bankruptcy law provided there is a reasonable likelihood that there will occur within a reasonable time in the future those elements necessary to constitute a cause of action.

The [directors] seem to imply that since their entitlement to indemnification from the Debtors first arose post-petition, and since they are rendering beneficial services to the Debtors post-petition, any 'claim' for indemnification as provided for in the [indemnification agreement] or under applicable state law will not have matured until after the filing of the petition, thereby creating post-petition priority for their legal costs. This argument assumes that the date when an indemnification action first could have been brought fixes the date upon which a bankruptcy 'claim' arose for the purpose of determining the priority status of their indemnification claim.

The court concluded that merely because a cause of action has not actually accrued under state law at the time the bankruptcy is filed, it does not necessarily follow that, for bankruptcy purposes, the claim has not accrued pre-petition. Considering the important policy of giving the debtor a fresh start as well as the breadth of the definition of "claim" in the Bankruptcy Code, the court held that the directors had a claim within the meaning of Section 101(4). Similarly, the court in *In re Christian Life Center*, 821 F.2d 1370 (9th Cir.1987), noted that it is not controlling that the duty to indemnify accrues post-petition, but that the crucial factor is whether the claim for indemnification arises from pre-petition occurrences. Here, the Gibson Action and the obligation to defend arose pre-petition. Any claim by American Casualty against

---

**2.** The directors sought payment of the legal expenses as an administrative claim, i.e. one arising post-petition. The unsecured creditors objected, contending that the claim was pre-petition.

the Debtors was a pre-petition contingent claim, subject to being liquidated if the Debtors breached the terms of the insurance policy by failing to defend.

The Debtors also contend that if the FDIC is permitted to proceed, the FDIC should pay the costs of the defense. The argument for the FDIC paying the Debtors' costs of defense is that as they have received a discharge and will not monetarily benefit from the litigation, they should not be forced to defend and be burdened with the associated expense. They further argue if the FDIC wishes to litigate to attempt to reap the monetary benefit of the policy, it should pay their costs of defense. The FDIC argues that under the American Rule, which requires opposing parties to litigation to be responsible for their own attorney fees, the Debtors are not entitled to reimbursement by the FDIC. The Debtors' argument has appeal if one accepts the premise that it is the FDIC who stands to benefit from the Gibson Action and that the Debtors are forced to defend. However, both aspects of the premise are erroneous.

The usual case involves a creditor seeking removal of the stay of Section 524 to maintain a state court action against a debtor in order to establish liability where the insurance carrier has recognized its obligations under the policy to provide a defense and to pay if the debtor is found liable. In that situation the creditor is entitled to relief only if the debtor bears none of the costs of defense. *In re Catania* 94 B.R. 250 (Bkrtcy.D.Mass.1989). However, the case before this Court does not involve the usual situation. Under the terms of the policy, American Casualty's obligation

for costs of defense and to pay must await a second action against American Casualty.[3] But, crucial issues will be determined in the Gibson Action. In the monetary sense, the real parties in interest in the Gibson Action are the FDIC and American Casualty. While it is apparent the FDIC will benefit from a successful pursuit of the Gibson Action, it must also be recognized that American Casualty stands to benefit from the defense of the Gibson Action. A successful defense equates to $1,000,000.00 not having to be paid on the claim. The true and ultimate adversaries, those who have something to win or lose, are the FDIC and American Casualty. If the FDIC is required to pay Debtors' attorney's fees in the Gibson Action, it would, in effect, be paying its adversary's attorney fees.

Nor are the Debtors obligated to defend the Gibson Action. The Debtors received a discharge through their bankruptcy and no objections to their discharge or dischargeability of the debt have been filed. So they have no liability to pay any judgment the FDIC might recover in the Gibson Action. Furthermore, as previously indicated, the FDIC is not seeking to enforce any judgment against them individually. Thus the Debtors have nothing to gain or lose monetarily in the Gibson Action. They can do nothing and let judgment be entered against them as it is not recoverable from them. In so doing they do not have to be concerned with liability to American Casualty for failure to defend. For the reasons set forth above, the Gibson Action and the obligation to defend all arose pre-petition and are dischargeable by their bankruptcy.[4] In sum, the Debtors are not forced to

---

**3.** It is significant that it was the Debtors who selected American Casualty and that American Casualty has accepted the premiums and issued a policy which in effect protects it until two judicial determinations are made. Moreover, the duty of the Debtors to defend was imposed by American Casualty by contracting for the type of coverage involved. *Zaborac v. American Casualty Co. of Reading, Pa., supra.*

**4.** The Debtors did not list American Casualty as having a contingent claim against them. However, under Section 523(a)(3), unlisted claims are only nondischargeable if the creditor had no

notice or actual knowledge of the case which would permit a claim to be timely filed. Surely American Casualty had actual knowledge of the Debtors' bankruptcy. Both the Gibson Action and American Action were pending at the time the Debtors filed their bankruptcy. American Casualty could have filed a claim. But, even if this is not true—if American Casualty did not have actual knowledge of the case to file a claim prior to the bar date—it may still file a claim and participate in any distribution pursuant to Section 726(a)(2)(C). And, as this Court has previously held in *In re Butt*, 68 B.R. 1001 (Bkrtcy.C.D.Ill.1987), a creditor who receives a

defend and incur defense costs. They are free to be the conduit through which the FDIC and American Casualty fight the battle. If American Casualty wants the Gibson Action defended, it should pay for it.

During the oral argument on the motion, the Debtors also contended they are forced to defend to avoid having a stain on their record, emphasizing that Wayne was still in the banking business and a ruling in the Gibson Action favorable to the FDIC would adversely affect his ability to perform in a normal fashion. Even if that is true, the fresh start policy imbedded in the Bankruptcy Code is monetary in nature and does not extend to protecting a debtor's reputation.[5]

Therefore, the Court finds that the Debtors' fresh start is not affected by the pursuit of the litigation, and the injunction provided by Section 524 does not bar the FDIC from proceeding against the Debtors in the Gibson Action. The Court further finds that there is no requirement for the FDIC to reimburse the Debtors for their costs of defending the Gibson Action.

The Debtors also requested an order indemnifying them from any post-petition liability arising as a result of the FDIC claims. This Court fails to perceive any basis for such relief. No action of the FDIC could result in the Debtors incurring post-petition liability. Initially it was the Debtors who, along with others, selected the form of insurance coverage, and it is the Debtors' actions which have given rise to potential claims against that coverage. All the FDIC is seeking to do is to establish that the Debtors' actions injured the bank and that American Casualty is liable on its policy.

■ The Debtors also filed a motion to have the bankruptcy estate pay the Debtors' attorney's fee of $9,995.65 incurred in opposing the claims of the FDIC, or to be incurred in the future in opposing those claims, all pursuant to Section 330(a)(1), 11 U.S.C. Sec. 330. Section 330(a)(1) allows the court to award to a debtor's attorney reasonable compensation for actual, necessary services rendered by the attorney based on the nature, the extent and the value of the services, the time spent on the services, and the cost of comparable services. It also allows the court to reimburse the attorney for actual and necessary expenses. The trustee objected to the Debtors' motion on the grounds the attorneys originally received a $12,500.00 retainer and their efforts in opposing the claims of the FDIC are of no benefit to the estate.

The trustee's position is well taken. The weight of authority under the Bankruptcy Act was that the debtor's attorney fees could be charged to the estate only where they were incurred in assisting the debtor in performing his duties or in promoting the administration of the estate. The Bankruptcy Code does not change this standard. 2 *Collier on Bankruptcy*, para. 330.04(3) (15th ed. 1988). In the case before this Court, the attorney fees were incurred, and will be incurred to prevent the FDIC from proceeding against the Debtors. Such action is in no way related to the Debtors' performance of their duties under the Code. Nor does it promote the administration of the Debtors' estate. The Trustee has filed an objection to the claim of the FDIC. The claim has been allowed only for purposes of computing an interim distribution with the Trustee reserving the right to object to the claim depending on the outcome of the Gibson and American

---

distribution pursuant to Section 726(a)(2)(C) cannot object to dischargeability under Section 523(a)(3).

5. Discussing the scope of the fresh start policy, the court in *In re Epstein,* 39 B.R. 938 (Bkrtcy. 1984), stated:

> The goal of all bankruptcy legislation is to achieve a just and equitable distribution of the estate to the creditors and to relieve the honest debtor of his debts, giving him a fresh start. Paying from the estate the attorneys

fees of a dishonest debtor, or one whose honesty is legitimately open to question unnecessarily favors the fresh start over the distribution to creditors. Every dollar paid administratively is a dollar less paid to the general creditors. The creditors are already financing the debtor's fresh start through their loss; it hardly seems equitable for them to finance the debtor's attempt to prove he is worthy of discharge. (Citation omitted).

Actions. Any action by the Debtors with respect to the disallowance of the FDIC claim would be duplicative of the Trustee's efforts in performing his duties, and hence, is noncompensable. *See Matter of W. T. Grant Co.*, 85 B.R. 250 (Bkrtcy.S.D.N.Y. 1988). There is no doubt that the attorneys for the Debtors have expended considerable time in resisting the FDIC's motion for modification of the permanent injunction. In so doing, the Debtors were seeking to protect their own interests. However, the FDIC has prevailed. Therefore, this Court does not perceive how the Debtors' efforts provided any protection for or benefit to the estate.

IT IS, THEREFORE, ORDERED that

1. The injunction provided by Section 524 is not a bar to the FDIC from proceeding against the Debtors in the Gibson Action, provided the Debtors shall have no personal liability for the payment of any judgment rendered against them in that action.

2. The Debtors' request for reimbursement for costs of defending the Gibson Action is denied.

3. The Debtors' motion for allowance of fees and objection to interim distribution is denied.

4. The Debtors' request that FDIC indemnify them from any post-petition liability arising as a result of the FDIC's claims is denied.