In the Matter of W.T. GRANT
COMPANY, Bankrupt.

**Bankruptcy No. 75 B 1735.**

United States Bankruptcy Court,
S.D. New York.

Feb. 2, 1988.

Weil, Gotshal & Manges, New York City, for trustee; Harvey R. Miller, Richard P. Krasnow, and Jacqueline Taubes, of counsel.

Davis Polk & Wardwell, New York City, for Morgan Guar. Trust Co. of N.Y.; Ogden Lewis and Philip C. Potter, Jr., of counsel.

Bader & Bader, White Plains, N.Y., for Bondholders; I. Walton Bader, of counsel.

Brewer & Soeiro, New York City, for Bondholders; Bradley R. Brewer, of counsel.

Whitman & Ransom, New York City for U.S. Trust; Richard N. Tilton, of counsel.

William Kuntz, III, Lake Placid, N.Y., applicant.

Seymour Licht, Scottsdale, Ariz., objectant See–More Light Investments.

Atty. Gen., State of Mich., Lansing, Mich., applicant; Theodore E. Hughes, of counsel.

Atty. Gen., State of Ill., Chicago, Ill., applicant; Neil F. Hartigan, Atty. Gen., and Joel R. Nathan, of counsel.

Victor Kurtz, New York City, applicant.

Cooper Cohen Singer Ecker, New York City, for applicant Morton S. Robson; Morton S. Robson, of counsel.

Howard, Rice, Nemerovski, Canaday, Robertson & Falk, San Francisco, Cal., for applicant Gordon Peitzman & Lopes; James L. Lopes, of counsel.

Howe Barnes Johnson, White Plains, N.Y., applicant.

Robert Al. Browne, White Plains, N.Y., applicant.

## OPINION AND DECISION CONCERNING FEE APPLICATIONS

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

On October 2, 1975, W.T. Grant Company ("Grant") filed a petition for an arrangement under Chapter XI, § 322 of the former Bankruptcy Act (the "Act"). Subsequently, by order dated April 13, 1976, Grant was adjudicated a bankrupt under the Act. Thereafter, Charles G. Rodman acted as trustee ("Trustee") for the bankrupt estate until his death on May 5, 1984. He was succeeded by Joseph Pardo.

At the time of the filing of the petition, Grant had recorded liabilities significantly in excess of one billion dollars. *In re W.T. Grant Company*, 4 B.R. 53 (Bankr.S.D.N.Y.1980). A major portion of such liabilities were represented by obligations to banks (the "Bank Claimants") and to holders of subordinated debentures. One of the Bank Claimants, Chase Manhattan Bank, N.A. ("Chase") was the former trustee under an indenture under which $92,507,000 of Grant's 4¾% unsecured subordinated debentures issued April 15, 1971 was outstanding as of the filing date of the petition. Prior to the filing of Grant's petition, Chase resigned as Indenture Trustee and was succeeded by United States Trust of New York ("U.S. Trust"). Similarly, Citibank was a Bank Claimant of Grant as well as being trustee under an indenture under which $834,000 of Grant's 4% unsecured subordinated debentures issued June 1, 1965 was outstanding as of October 2, 1975.

The Trustee's efforts to orchestrate the claims of secured suppliers, holders of senior debentures, Bank Claimants, general unsecured creditors and holders of the two issues of subordinated debentures resulted in a series of settlements and compromises with, *inter alia*, secured suppliers (approved on February 3, 1977), *aff'd* 578 F.2d 1372 (2d Cir.1978); senior debenture holders (approved on January 18, 1978); Bank Claimants (approved on July 20, 1978), *In re W.T. Grant Company*, 4 Bankr.Ct.Dec. 597 (Bankr.SDNY 1978);

Subordinated Debenture Holders (approved by decision and order dated February 20, 1980 as to the initial offer, *In re W.T. Grant Company*, 4 B.R. 53 (Bankr.S.D.N.Y.1980), and approved by order dated June 23, 1981 as to the subsequent offer, 20 B.R. 186 (S.D.N.Y.1982), *aff'd*, 699 F.2d 599 (2d Cir.1983), *cert denied, sub nom. Cosoff v. Rodman*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

The settlement with the Bank Claimants (the "Bank Settlement Agreement") resolved an adversary proceeding commenced by Bank Claimants against the Trustee. The Bank Claimants asserted that their claims constituted "Senior Indebtedness" pursuant to the provisions of the indentures and the subordinated debentures and further that the 4% and 4¾% Subordinated Debenture Holders' right of payment from assets of the bankrupt estate was subject to prior payment in full of all Senior Indebtedness.

Concurrently with his undertaking a one year investigation into the affairs of Grant under former Bankruptcy Rule 205(a), the Trustee interposed defenses asserting, *inter alia*, that the contractual subordination provisions in the indentures and subordinated debentures should not be enforced, that the claims of the Bank Claimants should be equitably subordinated to the extent of their domination and control of the bankrupt to the detriment of the estate, that such claimants were the recipients of fraudulent conveyances and that they improperly set-off monies against bankrupt accounts. *See In re W.T. Grant Company*, 4 Bankr.Ct.Dec. at 602. U.S. Trust shared the same objections raised by the Trustee.

The Bank Settlement Agreement (not to be confused with the Original Offer and Amended Offer, *infra*) was referred to as a "global settlement" by Galgay, B.J. as it provided a "framework for the further administration of the bankrupt estate and the satisfaction of claims filed against such estate." *In re W.T. Grant Company*, 4 Bankr.Ct.Dec. at 602. The settlement created a fund of $95,378,373, the full amount of the claims of the holders of the two

issues of subordinated debentures, plus accrued interest through October 2, 1975, pending resolution of their dispute with the Bank Claimants as to whether the subordination clause of their indentures should be given effect. As part of the compromise, the Trustee agreed not to sue 116 banks whose loans of $56,931,665.59 were paid by Grant in June 1975. Further, the bank claims were allowed in the minimum amount of $650,000,000. There was no appeal of said global settlement. *In re W.T. Grant Company,* 699 F.2d 599, 604 *cert. denied* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed. 2d 97 (1983).

Subsequent to Galgay, B.J. approval of the global settlement, the Trustee and the Bank Claimants commenced negotiations with U.S. Trust to resolve the dispute concerning the entitlement of Subordinated Debenture Holders to distributions from the assets of the bankrupt estate. Such negotiations culminated in a proposed offer of compromise and settlement (the "Original Offer"). Aside from U.S. Trust, no other Applicant participated in the negotiations which resulted in the Original Offer. The Original Offer provided for payment of 14% of the claims of accepting 4¾% Subordinated Debenture Holders ("Subordinated Debenture Holders") with a preservation of rights for all non-accepting Subordinated Debenture Holders whereby "neither the offer nor the bank settlement agreement was to have any effect in any proceeding brought by them." *In re W.T. Grant Company,* 699 F.2d at 605.

An *Ad Hoc* Protective Committee of 4¾% convertible subordinated debentures ("Subordinated Debentures"), including Victor Kurtz and ten other Subordinated Debenture Holders allegedly represented by counsel, and Applicants I. Walton Bader and Morton Robson ("Kurtz Objectants"), raised objections to the Original Offer. Kurtz Objectants asserted that: (1) the Trustee failed to make an adequate presentation of the facts and law relating to the controversy to support the approval of the offer; (2) the bank claims should be equitably subordinated as a consequence of the Banks Claimants' alleged control and domination of Grant; and (3) the Trustee, U.S.

Trust and their respective counsel were in positions of conflict of interest and should thereby be disqualified. In addition, Applicant-attorney Lopes appeared at the hearing on behalf of certain institutional Subordinated Debenture Holders raising other objections which were later resolved. 4 B.R. at 68. Over the objections raised by the above Applicants, Galgay, B.J. approved the Original Offer by order dated February 20, 1980. *In re W.T. Grant Company,* 4 B.R. 53 (Bankr.S.D.N.Y.1980).

Thereafter, appeals were taken to the District Court by the Kurtz Objectants represented by Bader and Robson (No. 80 Civ. 1857) and by Subordinated Debenture Holders Levy and three others represented by I. Walton Bader and Bradley Brewer. Brewer did not take an appeal on behalf of David Cosoff and Helen Finkelstein. *See, In re W.T. Grant Company,* 699 F.2d at 606. While these appeals were pending, the Trustee successfully brought an action to restrain five Subordinated Debenture Holders, represented by Bader, Brewer and Robson, from disseminating solicitation to holders of Grant 4¾% debentures.

The above action resulted in an order sometimes referred to as the "gag order." *In the Matter of W.T. Grant Company,* 6 B.R. 762 (Bankr.SDNY 1980). Brewer appealed said order to the District Court. After Brewer's appeal was taken, the District Court stayed consideration of that appeal as well as that of the two related appeals taken by Bader and Robson concerning the Original Offer, *supra,* while negotiation went forward under Bankruptcy Judge Galgay's supervision. *In re W.T. Grant Company,* 13 B.R. 1001, 1002 (SDNY 1981). At a conference held on April 7, 1981, Weil Gotshal & Manges, acting as attorneys for the Trustee, and the Bank Claimants communicated a new proposed settlement "Amended Offer" to Galgay, B.J., Robson and Bader. *In re W.T. Grant Company,* 13 B.R. at 1002. Although notified, Brewer did not attend such conference. *Id.* The Amended Offer provided the Subordinated Debenture Holders with a minimum recovery at 19% of the

face value of their investment. A maximum of 2% of the face value of the 4¾% Subordinated Debentures ("2% Cap") would be set aside for allowances of fees and expenses to Applicants. *See infra.* Further, "additional amounts not in excess of two cents on the dollar might be paid if allowed fees and expenses amount to less than 2% of the face value of all debentures tendered." *In re W.T. Grant Company,* 699 F.2d at 606 n. 10. The Amended Offer provided that:

> Any person or entity involved in the proceedings which were commenced by the Trustee's original application dated April 18, 1979 [seeking *approval of the original offer of compromise* and settlement], and in the formulation and effectiveness of the *Amended Offer* who believes that it is entitled to compensation for the services rendered in relation thereto may file an application for an allowance of compensation and/or reimbursement of *documented necessary proper out-of-pocket expenses,* with the court … (emphasis added) *Exhibit 1*

In addition, the Amended Offer contemplated that if this Court's approval of the Amended Offer were appealed, an additional dividend based upon all the interest earned on the monies held by the Trustee with respect to the reserve fund calculated from the date of the approval of the Amended Offer would accrue during the pendency of the appeal to accepting Subordinated Debenture Holders.

Bader and Robson agreed to withdraw their appeals with respect to the Original Offer in April of 1981. The Second Circuit noted that "Bader announced that although he had brought Brewer into the case and Brewer had signed his name on the briefs, Brewer was not the attorney for the Levy appellants who were Bader's clients, and had not signed the notice of appeal." 699 F.2d at 606.

One day beyond the deadline set for filing objections to the Amended Offer, David Cosoff retained Brewer to oppose said offer. At the June 16, 1981 hearing to consider the Amended Offer, Brewer objected to the "alleged inadequacy of notice and to the provisions concerning attorney's fees."

*In re W.T. Grant Company,* 699 F.2d at 606–07. However, as the District court noted in its affirmance of the Bankruptcy Court's approval of the Amended Offer, Brewer appeared at the hearing on June 16, 1981 "but he was still uncertain as to who he represented." *In re W.T. Grant Company,* 20 B.R. 186, 188 (Bankr.S.D.N.Y.1982). Over the objections raised by Brewer, on June 23, 1981, Galgay, B.J. approved the Amended Offer. On July 1, 1981, Cosoff and Finkelstein, represented by Brewer, and Miller and McGinnis (originally represented by Douglas F. Eaton and subsequently by Stuart E. Jackson) filed Notices of Appeal before J. Duffy. *In re W.T. Grant Company,* 20 B.R. 186 (S.D.N.Y.1982). The grounds for appeal were essentially the same argued before and rejected by Galgay, B.J. On March 15, 1982, the District Court affirmed the order of the bankruptcy court, 20 B.R. 186, holding that said Applicants were precluded by *res judicata* from contesting the decision on appeal after a first appeal had already been withdrawn and time to join in that appeal had expired.

Thereafter, Brewer appealed from the District Court's order to the Court of Appeals, Second Circuit, again on the same grounds which were rejected by the bankruptcy and district courts. The Second Circuit affirmed the lower court's judgment on the merits. 699 F.2d 599 (2d Cir.1983), *cert. denied, sub nom. Cosoff v. Rodman,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

Presently, the following individuals have submitted fee Applications for Allowances of Compensation and Reimbursement of Expenses in respect to the Subordinated Debentures: Robson & Miller ("Robson"); Bader & Bader ("Bader"); Brewer & Soeiro ("Brewer"); Robert Browne ("Browne"); Howe Barnes & Johnson ("Barnes"); Victor Kurtz ("Kurtz"); William Kuntz ("Kuntz"); Attorney General for the State of Illinois; Attorney General for the State of Michigan; Gordon, Peitzman & Lopes ("Lopes"); and U.S. Trust as Successor Indenture Trustee.

The aggregate amount of the requested fee applications without regard to supplemented fee applications is 2.6% ($2,401,-174.44) of the outstanding principal amount of the Subordinated Debentures. This exceeds the maximum permissible amount provided in the Amended Offer by the sum of $551,034.44. Evidentiary hearings were held before this court on December 12, 1986, December 15, 1986, December 17, 1986, and September 16, 1987.

Both the Trustee and Indenture Trustee submit to this court that while the Amended Offer resulted in an increased net recovery to Subordinated Debenture Holders of 5% on their claims, this amount merely represents what the Subordinated Debenture Holders would have received had the Original Offer been invested at prevailing rates from September 1, 1979 (the date in which distribution of dividends could have conceivably been made to the Subordinated Debenture Holders)[1] to September 23, 1981 (the date in which the Subordinated Debenture Holders began to earn interest on their Subordinated Debentures pursuant to the Amended Offer). *See Exhibits* 46, 48.

## DISCUSSION

In furtherance of the economical spirit of the Bankruptcy Act, this Court follows the well-established rule that an Applicant seeking an allowance with respect to claims for compensation and expenses in a bankruptcy proceeding has "the burden of proof to establish the beneficence and propriety of his services in terms of the allowance for which he seeks." *In re Yale Express System, Inc.*, 366 F.Supp. 1376, 1381 (S.D.N.Y.1973); *see also, Woods, Court Trustee v. City National Bank & Trust Co. of Chicago*, 312 U.S. 262, 268, 61 S.Ct. 493, 85 L.Ed. 820 (1941). This burden is difficult to overcome as the Second Circuit follows the American doctrine that an attorney is not entitled to recover attorney's fees from the estate. Collier on Bankruptcy ¶ 62.29(3) at 1582 (14 ed. 1975); *see also,*

*Guerin v. Weil Gotshal & Manges*, 205 F.2d 302 (2d Cir.1953). The same rule applies to fees requested by creditors. *Guerin*, 205 F.2d at 304. Also, in the interest of furthering the principle of economy, it is well settled that the "controlling precept of bankruptcy liquidation is the maintenance of *par condicio creditorum*, equality of treatment to all creditors, unless the statute itself provides a creditor or its attorney some priority." Collier on Bankruptcy ¶ 62.21 at 1550 (14 ed. 1975).

The pertinent statutory provisions are § 62 and § 64 of the Act and the accompanying former Rules 215 and 219. Section 62 authorizes the payment of actual and necessary fees and expenses by *officers* if said expenses are approved by the Court. Section 62 of the Act (emphasis added). The term "officer" is defined as including "clerk, marshall, receiver, custodian, referee and Trustee...." Section 1 of the Act.

It is evident that § 62 fails to explicitly provide for reimbursement of fees to creditors or creditors' counsel. The accompanying rule only speaks in terms of attorney for the trustee or receiver. *See* former Rule 215. The scope of § 64 is not much broader. In order to be reimbursable under § 64(a), a creditor's expense must fall under the following categories:

"(1) the costs and expenses of administration, including the actual and necessary costs ... of preserving the estate ... fees for the referees' salary and expense fund services ... filing fees paid by creditors in *involuntary* cases ... where property of the bankrupt, transferred or *concealed* by him ... is recovered ... by the efforts ... of one or more creditors, the reasonable costs and expenses of such recovery ... *one* reasonable attorney's fee ... irrespective of the number of attorneys employed ... to the *petitioning* creditors in *involuntary* cases ... 3) (where the confirmation of

1. The hearing on the Original Offer was scheduled for May 22, 1979. Consequently, U.S. Trust asserts that if Bader, Brewer and Robson had not objected to the Original Offer, J. Galgay could have reasonably entered an order approving the Original Offer by June 1, 1979. Said order would have become final on June 30, 1979 and thus distribution could have taken place on September 1, 1979. *See Exhibit* 46.

an arrangement ... has been refused ... through the efforts and at the cost ... of ... creditors, or, where through the efforts ... of ... creditors, evidence shall have been adduced resulting in the conviction of any person of an offense ... the reasonable costs ... of such creditors...." Section 64 of the Act. (emphasis added)

This court recognizes that the governing law of bankruptcy liquidation requires that an "omission by the legislator to provide for costs and expenses to creditors in a particular situation be construed as a purposed exclusion, not as a gap to be bridged by judicial legislation." 3 Collier on Bankruptcy ¶ 62.21 (14th ed. 1977); *accord Guerin v. Weil Gotshal & Manges*, 205 F.2d 302 (2d Cir.1953) (denying fee allowance to petitioning creditors in hiring accountants to ascertain the insolvency of the alleged bankrupt for lack of statutory or equitable relief). Consequently, it is evident that the legislators contemplated fees being paid to trustees and in certain circumstances, particularly in involuntary bankruptcy proceedings, to creditors. Indeed, we note that even where the Act provides for attorneys' fees, such allowance is limited to *one* attorney. Section 64 of the Act.

Furthermore, pursuant to § 62 the courts have recognized the importance of centralizing responsibility in the trustee in an effort to "preserve the estate from applications for allowances by numerous importunate claimants." *In the Matter of Sapphire Steamship Lines, Inc.* 509 F.2d 1242, 1245 (2d Cir.1975); *see also In re New York Investors, Inc.*, 130 F.2d 90, 91–92 (2d Cir.1942).

■ This is also consistent with the principle of maintaining equality of treatment among creditors so as to prevent unjust enrichment to those creditors who "rush in" to volunteer their services to the detriment of other creditors. *See In re Siegel*, 252 F. 197 (S.D.N.Y.1918). Consequently, anything done by a creditor's attorney, unless previously authorized by the court and performed in direct employment by the Trustee, is considered by the court as a "gratuitous labor of love." *See* 3 Collier

on Bankruptcy ¶ 62.29(3) at 1583 (14 ed. 1975). It is extremely important that the message in Collier be recognized by professionals because the bankruptcy system cannot or should not be perceived as a public trough at which professionals may feed. Although it may be argued that the bankruptcy court, as a court of equity, may award attorneys' fees and expenses, we respond by acknowledging that "equity is grudgingly administered in the award of counsel fees." *Sapphire Steamship* 509 F.2d 1242, 1245 (2d Cir.1975). Consequently, we reemphasize that an applicant must satisfy a great burden of proof to justify its request for compensation and expenses.

In *Sapphire Steamship, supra,* the Second Circuit disallowed fees to counsel for two creditors for such counsel did not satisfy its burden of proof in justifying a fee allowance. In that case, the debtor, prior to its adjudication as a bankrupt, instituted an action to recover from several antitrust violators. Special counsel for the trustee concluded that there was insufficient evidence on the issue of damages and, therefore, recommended that a settlement be accepted. 509 F.2d at 1243. Objections to such settlement were raised by counsel representing some of the creditors and the United States Government. In addressing the arguments raised by Winthrop, Stimson, Putnam & Roberts, counsel for the objecting creditors, the Second Circuit recognized that:

Although it is true, as they point out, that the fund was created by the third offer of $2,473,070 which Winthrop, Stimson continued vigorously to oppose, the district court's finding that the activities of the Winthrop, Stimson firm contributed to the reconsideration and disapproval of the first two offers is supported by the record, and, because the rejections of the first two offers were prerequisites for the proposal and eventual acceptance of the final settlement, it is a reasonable inference that Winthrop, Stimson "contributed to" the creation of the additional $800,000 fund. In spite of this finding, however, the district court was in error in holding that Winthrop,

Stimson was entitled to fees from the bankruptcy estate. 509 F.2d at 1244–1245. (footnotes omitted)

In its decision, the *Sapphire* court was guided by the general rule of disallowing attorneys' fees from the estate and further noted that the case before it did not fall under any exception. *Id.* at 1244. In determining whether such an exception existed, the Second Circuit incorporated the use of a three-factor test which accordingly requires that an applicant requesting fees satisfy all three prongs. The applicant must prove the existence of the following: (1) the trustee has refused or neglected to act; (2) the applicant has conferred a tangible benefit on all creditors by acting in the trustee's stead; and (3) the bankruptcy court must have formally authorized such attorney to act instead of the trustee. *See also, In re Porto Rican American Tobacco Co.,* 117 F.2d 599 (2d Cir.1941); *In re Progress Lektro Shave Corporation,* 117 F.2d 602 (2d Cir.1941).

In addressing the first factor, the *Sapphire* court stated as follows:

A trustee "refuses" or "neglects" to act when he fails to satisfy a duty imposed upon him by the Bankruptcy Act, which requires that he marshall the assets of the bankrupt and, as with all his substantive duties, exercise reasonable care in so doing. 11 U.S.C. § 75. The trustee in this case did not refuse or neglect to pursue Sapphire's antitrust cause of action, nor did the district court find that he violated his duty of care in that pursuit. Although subsequent events established that the strategic decision to recommend acceptance of the first offer of $1,600,000 was a mistake of judgment, to conclude therefrom, that the trustee "refused" or "neglected" to act would encourage creditors and their attorneys constantly to "second-guess" the trustee's decisions. Such a result would contravene the policy of preserving the estate by centralizing responsibility in the trustee. 509 F.2d at 1245.

Further, although the *Sapphire* court recognized that the creditors conferred a benefit in contributing to the creation of the additional fund, *supra,* counsel's failure to obtain court authorization precluded it from receiving a fee allowance. The *Sapphire* court did recognize, however, that the Second Circuit had in the past waived court approval in special circumstances where, for instance, an objecting counsel successfully opposed exorbitant fee applications of the trustee and his counsel which the trustee would not oppose. *See In re New York Investors,* 130 F.2d 90 (2d Cir.1942). Nevertheless the *Sapphire* court held that counsel's services in *Sapphire* were not brought on by any such circumstances. According to the court, to waive prior approval requirement for all cases in which counsel may successfully oppose the trustee "would contravene the policy of the Bankruptcy Act, and is not necessary for the protection of creditors." 509 F.2d at 1246. The *Sapphire* decision, *supra,* exemplified the general reluctance of courts in granting relief to applicants who have not satisfied the requisite requirements.

In the instant case, the Applicants before this court, *inter alia,* Bradley Brewer, I. Walton Bader and Morton Robson, also seek reimbursement from the estate for services which were never authorized by this court. This case, however, presents an additional level of complexity and intrigue. The Amended Offer as approved provides for the payment of fees and expenses to those who were involved in the proceedings relating to the Original Offer and contributed to the formulation and effectiveness of the Amended Offer *notwithstanding* the fact that such individuals were *unauthorized* to act by the court. Consequently, in accordance with the Amended Offer, as approved, this court will not consider those services which were unrelated to the formulation of the Original Offer and the Amended Offer. This obviates the need to consider the amounts requested in the supplemental applications filed by Applicants since such amounts are for services subsequent to June 23, 1981, the date on which the Amended Offer was approved. Although the Applicants in this case are relieved of the burden of showing prior

court authorization, said Applicants are nonetheless required to satisfy the first two factors described above. *Sapphire,* 509 F.2d at 1245.

■ The first prong requiring an Applicant to show a "refusal" or "a neglect" on the part of the Trustee to act is difficult to satisfy. This was illustrated in the *Sapphire* decision. *See Sapphire,* 509 F.2d at 1246.

It is evident that from the inception of this case, the Trustee was actually involved in achieving a series of compromises and settlements which were approved. Galgay, B.J. noted, for instance, that "[t]he record establishes that he [Mr. Rodman] has conducted a thorough examination of the relationship of the Bank Claimants with Grant." 4 B.R. at 82. Further, according to Galgay, B.J., "He [Mr. Rodman] successfully negotiated the Bank Settlement Agreement which significantly reduced the dividends that the Bank Claimants might otherwise have received and which resulted in material benefit to other creditors." 4 B.R. at 82. Thereafter, the Trustee was involved in further settlement negotiations. *See supra.* The contention that Mr. Rodman was unable to perform his duties objectively because his name was submitted as a candidate for standing Trustee in Chapter XI cases was rejected by the Bankruptcy Court 4 B.R. at 81. Likewise, the contention that Weil Gotshal & Manges was in an adverse position in that it was counsel to the Creditors' Committee prior to its becoming counsel for Trustee was held to be without merit. 699 F.2d at 612–13.

Furthermore, in this case, in addition to there being a Trustee, there is also an Indenture Trustee, U.S. Trust, which is authorized contractually as well as statutorily to act on behalf of debenture holders under the Trust Indenture Act of 1939, 15 U.S.C. 77aaa, *et seq.* Section 315(c) of the Trust Indenture Act requires indentures to provide that, upon the obligor's default as defined in the indenture, the Trustee is to exercise:

... such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs. 15 U.S.C. § 77*ooo* (c)

In addressing the objections raised by the Kurtz Objectants against U.S. Trust, Galgay, B.J. noted that:

I am satisfied that U.S. Trust has adequately represented the interests of the 4¾% Subordinated Debentureholders since the commencement of the bankruptcy case. U.S. Trust and its attorneys actively participated in the investigation of the Bank Claimants by the Trustee. In connection with the compromise and settlement of the claims of Secured Suppliers of Grant, holders of Grant 4¾% Sinking Fund Debentures and the Bank Claimants, U.S. Trust was heavily involved. The assertion by the Kurtz Objectants that U.S. Trust is subject to disqualifying conflicts of interest because of other business relationships with Chase and one or more of the Bank Claimants is not substantiated by the record. There is no evidence that U.S. Trust has been negligent or otherwise deficient in the discharge of its responsibilities as Indenture Trustee for the 4¾% Subordinated Debentures. Disqualification of an Indenture Trustee and its attorneys may not be granted on the basis of unsupported and ephemeral assertions. 4 B.R. at 84.

Consequently, to award attorneys' fees for services performed by an Applicant when in fact such services were performed satisfactorily by a trustee and an indenture trustee is seemingly incongruous and contrary to the precepts of bankruptcy. In the immediate case theories of equitable subordination, for example, were asserted and fully exhausted against the banks by both the Trustee and the Indenture Trustee. Yet, Applicants seek fees for the research and preparation of arguments addressing the theory of equitable subordination. *See infra.* Furthermore, as illustrated above, the contention that both the Trustee and the Indenture Trustee and their respective attorneys were in positions

of conflict of interest and were thus unable to adequately perform their functions is unwarranted. *See* 4 B.R. at 80. Consequently, we are satisfied that neither the Trustee and its attorneys nor the Indenture Trustee and its counsel "refused" or "neglected to act." *See supra.* As mentioned above, an Applicant's failure to satisfy all *three* prongs precludes it from recovery. For purposes of discussion, however we will examine factor two, the benefit conferred on the estate. We reemphasize that the benefit must be conferred on *all* creditors in the proceeding, *supra*, which is consistent with the principle of maintaining equality of treatment to all creditors. *See In the Matter of American Express Warehousing Ltd.*, 525 F.2d 1012 (2d Cir.1975).

In *In re United Merchants & Manufacturers, Inc.*, 10 B.R. 312 (S.D.N.Y.1981), counsel for lenders successfully challenged compensation requested by co-counsel to the creditors' committee. Such fees were denied despite the fact that the loan agreement provided for attorneys' fees to counsel and that said attorneys conferred a benefit to the estate. In denying the requested fees, the court recognized that the primary purpose of the Bankruptcy Act is "to bring about an an equitable distribution among creditors...." *In re United Merchants & Manufacturers, Inc.*, 10 B.R. at 314 (*quoting Kothe v. R.C. Taylor Trust*, 280 U.S. 224, 227, 50 S.Ct. 142, 143, 74 L.Ed. 382, 385 (1930)). Thus, the *Merchants* court held that in "furtherance of this primary purpose, a bankruptcy court will not enforce any provision in a contract between a bankrupt (or debtor) and one of his creditors which ... looking towards the possibility of bankruptcy ... would give the latter a preferred position over other creditors in the event of such bankruptcy." 10 B.R. at 314.

On a similar note, in the case before us, the Trustee and U.S. Trust assert that the increased net recovery to Subordinated Debenture Holders of 2% on their claims as provided by the Amended Offer is essentially equal to the interest at prevailing rates from May 1979. Such assertion is based on the supposition that had Applicants Bader, Brewer and Robson not ob-

jected to the Original Offer, Galgay, B.J. could have conceivably entered an order on June 1, 1979, ten days after the hearing on said offer. Accordingly, such order would have become final on June 30, 1979 and distribution could have taken place on September 1, 1979. *See Exhibit* 46, at 6. At prime rate charged by banks on short term business loans, U.S. Trust asserts from its supporting documents that from September 1, 1979 to September, 1981, the month in which the 21% of the face value of the Subordinated Debentures as provided by the Amended Offer began to earn interest, the total amount of interest which would have been payable based on financial statistics annexed to *Exhibit* 46 was $4,490,-968.17. *See Exhibit* 46. Adding this interest to the 14% of the face value of the Subordinated Debentures as provided under the Original Offer (14% × $92,507,000 = $12,950,980), totals $17,441,948.17 This is merely $134,382 less than the distribution under the Amended Offer. *Id.*

Assuming the above argument, it follows that the only true benefit to the Subordinated Debenture Holders would seemingly come from a distribution to them of all or some of the monies set aside under the 2% cap. *See supra.*

Conversely, assuming the arguments raised by the Trustee, if a sum equal to the maximum amount set forth under the 2% cap is awarded to the Applicants, then we would be in essence awarding Applicants for a benefit that was incurred solely for themselves. Also, by awarding such allowances to the Applicants, we would be essentially requiring the Subordinated Debenture Holders, the vast majority of whom did *not* request the services of Applicants Brewer, Robson and Bader, to share in the payment of said Applicants' fees. Adding insult to injury, we further note that 95% of the Subordinated Debenture Holders were placed in a detrimental position particularly by Applicant Bradley Brewer, as they were unable to recover any portion of their investment for a protracted period of more than three years following the approval of the Original Offer. *See Exhibit* 46. Although that detriment was some-

what ameliorated by the entitlement of interest on the 21% of the principal amount of Subordinated Debentures, *supra,* the accepting Subordinated Debenture Holders were nonetheless prevented from investing their shares to yield a better rate of return than the Trustee received. Said period coincided with the numerous appeals taken by Mr. Brewer, *supra,* and the petition for certiorari.

Seemingly, shifting Applicants' costs onto the Subordinated Debenture Holders is in violation of the principle of equality, *supra,* and it is contrary to basic contract law as this court lacks the power to impose contractual retainers on non-consenting parties.

We further note that there are issues as to whether Applicants such as Brewer, Robson and Bader were even retained by their purported clients. *See infra, Johnson* Factors (2). The interrelationship between said attorneys might have shed some light on the above issue except that said relationship presents issues in and of itself.

Robson, for example, testified that he acted as counsel to Bader thereby representing the same parties. Yet, there was no written contract signed by both parties evidencing a co-counsel agreement. December 12, 1986 T. 69, 96, 125; *Exhibit* 55. Robson never contacted his purported clients and failed to question whether Bader was even authorized by his clients to make Robson co-counsel. *Exhibit* 13, ¶ 13, December 12, 1986 T. 71. Brewer asserted in its application that "Robson was never authorized to represent or to appear on behalf of any shareholder other than Mr. Kurtz, nor did he ever receive any retainer, written or oral, from any other shareholder of which I am aware." *Exhibit* 13, ¶ 7. Robson further asserts that it "appeared in the form of a class action representative...." December 12, 1986 T. 54. This assertion is without merit especially since said "class" did not meet the requirements set forth under Fed.R.Civ.P. 23, *inter alia,* class certification. *See Marcera v. Chinlund,* 595 F.2d 1231 (2d Cir.1979).

In terms of Bradley Brewer, he too claimed to be co-counsel of Bader. *Exhibit*

19 ¶ 6. Such assertion, however, has been challenged by the other two Applicants. *See* December 12, 1986 T. 93 and December 15, 1986 T. 421; *see also* 699 F.2d at 606; 20 B.R. at 188.

Similarly, Bader's Application for fees and expenses contains a five-page list of bondholders which said Applicant claims to have represented. The court seriously questions whether said Applicant was ever adequately retained. *See,* e.g., December 15, 1986 T. 374, 380–89, 393–94, 398–411, 433–37.

In light of the above, we hold that Bader, Robson and Brewer did not meet their burden of proof in satisfying factors one and two. See *supra.* Nevertheless, for purposes of discussion, we have chosen to incorporate yet an additional test used to assess the reasonableness of the requested fees. The following determinate factors ("*Johnson* Factors") to be considered in undertaking such review are: (1) the time and labor spent; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitation imposed by the client or circumstances; (8) the amount involved and result obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. In *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), ("*Johnson* Factors").

█ When considering the time and labor spent by Applicants, *supra,* this court recognizes the importance of maintaining accurate and specific records. *In the Matter of Borgenicht,* 470 F.2d 283, 284 (2d.Cir.1972). In *In the Matter of Hudson and Manhattan Railroad Co.,* 339 F.2d 114 (2d Cir.1964), the Court of Appeals held that:

"[A]ny attorney who hopes to obtain an allowance from the court should keep accurate and current records of work

done and time spent. Lawyers are well aware that, especially where services of the nature here involved are spread over a period of time and ultimate payment is virtually assured, they are valued principally on the basis of the time required. There is no excuse for an established law firm to rely on *estimates made on the eve of payment* and almost entirely unsupported by daily records or for it to expect a court to do so. (emphasis added)

Id. at 115. *See also In the Matter of The Wal–Feld Company,* 345 F.2d 676 (2d Cir. 1965).

■ The above decisions support the statutory language of § 62 of the Act and Rule 219 requiring that only necessary costs and expenses which are reported in *detail* may be examined and approved or disapproved by the Court. (Emphasis added) The Amended Offer as approved also provides that these expenses be "documented," *supra.* Thus, as courts have held in the past, a bare statement of total hours without providing sufficient detail to make a determination as to the reasonableness of the request is insufficient. *See In the Matter of Wal–Feld Company,* 345 F.2d at 677. Similarly, the court in *In re Garland Corp.* held that failure to provide detailed documentation in support of application for fee award precluded award for such claimed time. *In re Garland Corp.,* 8 B.R. 826, 829 (Bankr.Mass.1981); *see also In re Meade Land & Development Co., Inc.,* 527 F.2d 280, 284 (3rd Cir.1975). The *Meade* court, *supra,* recognized that it is not a court's duty to speculate when the record is insufficient. *In re Meade Land & Development Co., Inc.,* 527 F.2d at 284.

In the case at bar, Applicant Bader seeks fees for 200 hours of unrecorded time as well as for its recorded time. Bader attempts to attribute its unrecorded time to "telephone conversations" and "conferences." Bader also seeks reimbursement of $600.00 of unrecorded disbursements representing photocopies and telephone calls. It is impossible to ascertain when such services were rendered and if they contributed to the formulation of the Amended Offer. *See, supra.* Consequently, this court is asked to speculate to the detriment of the Subordinated Debenture Holders, a task we refuse to undertake. To accept such an offer would be inequitable and contrary to the underlying principle of economy. *Jacobowitz v. Double Seven Corp.,* 378 F.2d 405 (9th Cir.1967). As Bader was the only Applicant among the "trio" seeking fees for unrecorded time and unrecorded disbursements, we will now address the Applicants' recorded time.

In focusing on the Applicants' request for compensation and reimbursement for recorded time, the court focuses in on 1, 2 and 9 of the *Johnson* factors. 488 F.2d at 715. We note that the aggregate hours rendered by all three Applicants are substantial. Yet, it is extremely difficult, if not impossible, to account for each Applicant's time when the services are seemingly duplicative and often non-legal. It is well-settled that "duplicative" or "non-legal" time is non-compensable. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir.1974); *see also, Meade,* 527 F.2d at 285. Further, we reemphasize the fact that we will not exceed the boundaries set forth by J. Galgay in the Amended Offer. *See supra.*

■ With this in mind, we continue our analysis with Bader, this time focusing on recorded time. The position taken by this court in reference to Bader's unrecorded time is again applicable to Bader's request for recorded time as the recorded entries are overly broad. The narrative part of the time sheet, which resembles a "storybook" more than a fee application, does little to detail each individual entry. The exact day in which such services were performed is not indicated by the entries of the time sheets. Seemingly, a vast majority of time was spent on activities unrelated to the formulation of the Amended Offer. The last entry on said time sheet refers to the "study of Chapter XI petition" in October 1975 (21 hours). On December 15, 1986, Applicant testified before this court that such entry actually referred to the study of law involved in a motion to convert the Chapter XI case to Chapter X. December

15, 1986 T. 469. Other entries include approximately 37 additional hours spent for the study of law applicable to a conversion and the preparation of papers to oppose Grant's motion to dismiss. The study of the law can hardly be considered a compensable service. *See In re St. Pierre*, 4 B.R. 184, 186 (Bankr.D.R.I.1980). Such study is essentially in the nature of "continuing education" and Bader's request for fees and compensation for such research basically is as stated in *St. Pierre.* Paraphrasing, the situation would not be much different if counsel had attended a seminar on the new Code and then billed the time and registration fee to this case. *Id.* at 186 n. 6. Grant's motion to dismiss was nonetheless granted for Bader's failure to bring on his motion in Bankruptcy Court instead of District Court. In essence, Bader is seeking reimbursement for his own mistakes and for services unrelated to the Original Offer or Amended Offer ("unrelated services"). Following the District Court's dismissal of Applicant's Motion to Convert, Applicant brought on its motion in Bankruptcy Court. This time, the motion was denied possibly for Applicant's failure to provide proper notice December 15, 1986 T. 471.

Supposedly, the above unsuccessful actions were taken on behalf of only one client, Mr. Lewy. Yet, Applicant never even signed a notice of appearance on behalf of its purported client. December 15, 1986 T. 472–73. Other examples of unrelated services rendered primarily for Applicant's client include: "preparing, filing and withdrawing an appeal denying Grant's aborted Chapter XI case (12 hours); study of adjudication of Grant as bankrupt and attendance at meeting in April 1976 (35 hours); and preparing applications, attending hearings and conferences and reviewing pleadings, in respect of the pending fee applications (85.8 hours)." *Exhibit 13.*

■ Most of the other hours spent are attributable to "conferences with bondholders." The nature of such services is more fully described in Brewer's fee application as follows: "Mr. Bader devoted his efforts mainly to making personal contact with an increasing number of objecting bondholders ..." *Exhibit* 19. ¶ 13.; "Mr. Bader devoted a massive amount of time to 'client relations,' which included a vast number of telephone conversations with various bondholders and a substantial number of trips to visit individual bondholders and bondholder representatives in various parts of the country...." *Exhibit* 19, ¶ 26. Indeed, "conferences with bondholders" is analogous to solicitation, again a service that is clearly non-legal and thus non-compensable. *See supra.* Bader's assertions that his solicitation efforts significantly contributed to the formulation of the Amended Offer is unsubstantiated. Indeed, the scope of Applicant's client representation is seemingly both limited and ephemeral. Mr. Kurtz, for instance, retained Robson as co-counsel because of his dissatisfaction with services rendered by Bader. December 15, 1986 T. 514. Further, the "Ad Hock [sic] W.T. Grant Debenture Holders Protective Committee," which was organized by Bader and Kurtz, had never once held a meeting. December 15, 1986 T. 395, 397. Lastly, in respect to Bader's fee application, this court also questions the validity of Bader's request for fees in regard to the study of law relative to equitable subordination since Brewer and Robson also seek credit for such research.

Brewer asserts that it conducted extensive research into the field of equitable subordination and conflict of interest. Like the Application submitted by Bader, *supra*, Brewer's Application consists of overly broad entries accompanied by a "storybook" narrative. The entries provide the years in which the services were rendered, not the month or day. Out of the 540 hours of services purportedly rendered in 1975, 340 are attributable to research and writing on equitable distribution. *Exhibit* 19 ¶ 20. For the year "1979", Brewer claims to have rendered 361 hours of services, most of which were attributable to theories of equitable subordination and to conflict of interest research. *Exhibit* 19 ¶ 20. Similarly, Robson attributes much of its time to the study of equitable subordination. December 12, 1886 T. 54, 57. All

three Applicants assert that the theory of equitable subordination was unique and complex. December 12, 1986 T. 72, 84. Such assertions might have been true forty or so years ago when *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) was decided, but are certainly incorrect today. Furthermore, such arguments were not novel to the case before us since these arguments were raised by both the Trustee and Indenture Trustee prior to the formulation of the Original Offer. *See supra.* As indicated previously, Galgay, B.J. noted that "the hearing before the court demonstrated that the Trustee had carefully weighed the probability of successful prosecution of contentions to invalidate the contractual subordination provision, relating to the 4% and 4¾% debentures." 4 B.R. at 77. Likewise, in addressing the arguments of the Kurtz Objectants to the Original Offer, Galgay, B.J. stated that the "probabilities of success as to the prosecution of claims of equitable subordination are very remote. In that context the Trustee's recommendation is well founded." 4 B.R. at 77. Similarly, Galgay, B.J. rejected arguments challenging the impartiality of the Trustee and Indenture Trustee. 4 B.R. at 81, 84. In spite of these findings, Bader and Robson appealed the Bankruptcy Court's order to the District Court and then subsequently withdrew their appeals. Thereafter, Brewer appealed to the Court of Appeals for the Second Circuit, asserting the same unsuccessful arguments argued before and rejected by the Bankruptcy Court and the District Court. Again, such arguments were rejected. 699 F.2d 599 (2d Cir.1983), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

In focusing on the *Johnson* Factors, *supra,* (1), (2) (3) and (9), this court holds that the theory of equitable subordination was not novel; that although Applicants spent a significant length of time researching and preparing documents, the time was excessive because of the Applicants' unfamiliarity with bankruptcy law in general, *See* December 12, 1986 T. 81, T. 71–72; that Applicants lacked the requisite skill; and that Applicants, continued to raise objections based on theories of equitable subor-dination and conflict of interest despite the minimal probability of success of said arguments.

Similarly, other unsuccessful actions for which Applicants seek compensation consist of the "gag order" actions. *See supra.* In enjoining Brewer, Bader and Robson from disseminating solicitation to 2,300 other holders of debentures, Galgay, B.J. noted that the communication was an unlawful solicitation pursuant to former Bankruptcy Rule 208(a) governing proxy solicitation and the Securities and Exchange Act of 1934 as it contained misleading statements and material omissions. 6 B.R. at 766. Thereafter, Brewer appealed the above order to the District Court which stayed such appeal so that settlement negotiations could go forward. 13 B.R. at 1002–1003.

Brewer attributes 206 hours of a total of 420 hours in "1980" to "work on the appeal from the Injunctive 'gag order' issued by bankruptcy court on 9/15/80." *Exhibit* 19. From Robson's computerized time sheets, it is impossible to determine the total number of hours spent on preparation related to the "gag order." The entries in the Robson Fee Application are overly broad. Examples of such entries are as follows: "conferences with Bader;" "hearing re: Preliminary Injunction Enjoining Dissemination of Compromise Offer;" "telephone calls with Bader;" "telephone call;" and "preparation of Application for Allowances." *Exhibit* 38.

As a whole, Applicants Bader, Brewer and Robson have failed to bear the burden of proving to this court that services such as those incident to the gag order contributed and were beneficial to the Amended Offer. Nevertheless, for such unrelated, unsuccessful and volunteered services, Applicants seek fees in an amount in excess of customary fees.

Beginning with Bader, said Applicant seeks fees in the amount of $375,379 for 1,532 hours of unrecorded and recorded services and $20,453 in recorded and unrecorded disbursements. Transcript at 458. To arrive at said fees, Bader applied a 1.5 contingency factor in an amount of $250,-253. The amount of $250,253 was based on

"lodestar" rate of $150.00 per hour of rendered services. The "lodestar rate," *infra,* is based on the benefit conferred on the Subordinated Debenture Holders. It is also noted that the fee request included a $15,000 disbursement request for Applicants Browne and Barnes, yet these two individuals have submitted their own fee applications.

Similarly, Robson seeks fees in the aggregate of $400,000 based on 1095.3 hours. Approximately 43.4 hours are attributable to time spent on Fee Application preparation, a service of which is non-compensable in this case. The aggregate amount includes a fee request of $70,000 based on a disbursement to Victor Kurtz, an Applicant who submitted his own fee Application for such amount. *See, infra.* At the customary billing rates, the requested amount would be reduced from $330,000 to approximately $142,150. The request for $330,000 in allowances is approximately 2.21 to 2.32 times greater than regular billing rates of approximately $128 per hour for all levels of Robson's attorneys and law clerks. It is important to note that the usual billing rate for law clerks, associates and partners (other than Morton Robson) ranges from $35 to $100 an hour. *Exhibit* 38, ¶ 44.

Robson asserts that a contingency type of compensation is based on the alleged benefit resulting from the formulation and implementation of the Amended Offer and the complexity of issues involved in this case. *See supra; see also Exhibit* 38. Furthermore, Robson seeks disbursements in the aggregate of $14,231.42. Applicant Brewer also seeks fees at $183,500 based on a "lodestar rate" of $125 an hour. As noted previously, *supra,* the "lodestar rate" is based on the benefit conferred on the Subordinated Debenture Holders. Yet, we note that Brewer spent his time opposing every proposed settlement despite minimal probabilities of success.

In terms of Applicants' requests for a premium fee, we hold that such requests are unwarranted. The Second Circuit has recognized the "lodestar" principle whereby a basic per hour rate is multiplied by a factor which takes into account both results achieved and quality of services rendered. *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir.1974). However, the court in *Grinnell, supra,* cautioned against excessive reliance on the contingent fee syndrome through which attorneys might achieve undeserved windfall fees. Similarly, the United States Supreme Court cautioned against excessive reliance on the multipliers and consequently limited an upward adjustment to rare cases where the fee applicant offers "specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was exceptional." *See Blum Commissioner New York State Department of Social Services v. Stenson,* 465 U.S. 886, 899, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891 (1984).

In *Blum, supra,* attorneys from Legal Aid filed a civil rights action on behalf of a statewide class and obtained successful results. According to the United States Supreme Court, the "novelty and complexity of the issues presumably were fully reflected in the number of billable hours recorded by counsel and thus do not warrant an upward adjustment in a fee request on the number of billable hours times at reasonable hourly rates." 465 U.S. at 898, 104 S.Ct. at 1549; *see also Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed. 2d 40 (1983).

In light of the above, we hold that Applicants have failed to demonstrate that their services were exceptional. Thus, such services do not warrant a premium. Indeed, this court is not convinced that Applicants' services warrant reimbursement at regular rates especially since their underlying strategies were to stall and delay, in hope that such stalling tactics would result in an increase in the size of the Original Offer and the Amended Offer. Moreover, if we focus on the expectations of the Applicants it is evident that Applicants only anticipated a contingent fee arrangement whereby reimbursement was conditional upon the *success* of Applicants' services. *See* December 12, 1986 T. 253. *See Johnson* Factors (6). Again, the alleged "benefit"

or "success" is a controverted issue. *Supra; see also, Johnson* Factor (8). Lastly, in addressing *Johnson* factors 4, 10 and 12, Applicants have not demonstrated to this Court that this case was undesirable, that it precluded Applicants from seeking other employments, and that awards in similar cases were granted. Indeed, even if the above were established, we note that the rendition of Applicants' services was by choice as they were not retained by the court or by the majority of Subordinated Debenture Holders.

Consequently, we hold that Applicants Bader, Brewer and Robson have not satisfied the above standards, *supra*, used to determine entitlement and reasonableness of fee applications. *See Sapphire* 509 F.2d at 1244; *Johnson*, 488 F.2d at 715.

■ Similarly, we are not convinced that Kurtz, Kuntz, Barnes and Browne proved an entitlement to allowances. We reemphasize that the same standards for fee allowances set forth above in our discussion of Bader, Robson and Brewer are also applicable to non-attorneys. *See In re New York Investors*, 130 F.2d at 90. We further reemphasize that the statutory language of section 62 of the Act does not provide for allowances to non-attorneys and section 64 of the Act provides allowances in limited circumstances not applicable to this case. In *Crooker v. Department of the Treasury*, 634 F.2d 48 (2d Cir.1980), in denying fees to a *pro se* prisoner in a Freedom of Information Act (FOIA) action, the Second Circuit expressed uncertainty as to whether Congress had intended the FOIA statutory language to make attorneys fees available only to licensed members of the bar or also to *pro se* litigants. Similarly, *In re Emergency Beacon Corporation*, 27 B.R. 757, 768 (Bankr.S.D.N.Y.1983), the court recognized that the lack of statutory authority for fees precluded *pro se* applicant from receiving an award. In precluding fees to said Applicant the court held as follows:

It cannot be over emphasized that in the instant case there is no statutory authorization for fees to bring the controversy within that narrow exception to the American Rule. Indeed, even if all of the foregoing Circuit decisions unanimously approved *pro se* counsel fees for non-attorneys pursuant to the various statutes involved in these cases, the rulings would not be instructive in the present situation, where Mr. Glatzer is requesting attorney fees without any statutory authorization to ease him over the American Rule hurdle. *Id.* at 768.

Consequently, we conclude there exists no basis in law which supports the concept of granting any compensation to a litigant in pursuit of his own self-interest and gain. If, as Applicants assert, there was actually a benefit conferred on the Subordinated Debenture Holders by virtue of the formulation and implementation of the Amended Offer, it then follows that said Applicants were already compensated for their efforts in the context of their increased recovery under the Amended Offer. *See,* e.g., *Exhibits* 34 through 37, 52; *see also In the Matter of Emergency Beacon Corp.,* 52 B.R. 979, 995–97 (S.D.N.Y.1985).

Even if an allowance of expenses to a litigant could be legally justifiable, the services rendered by Kurtz were not compensable as they are unrelated to the formulation of the Original Offer and Amended Offer. *See supra, Johnson.* Such services include, *inter alia,* attendance at all court proceedings commencing in early 1976; attendance at meetings and court hearings in connection with the Chapter XI case commenced by bankrupt, opposing the sale of the bankrupt's accounts receivable in November, 1976, and the preparation and distribution of some 600 letters during the period from March 1976 through January 24, 1981 to various addresses, including the court, the trustee.... See *Exhibit* 34. We further note that Kurtz seeks credit for his alleged position as chairman of the Ad Hoc Debentureholders Protective Committee, *supra,* when in fact there is no evidence of said Committee ever meeting. *See supra.* Additionally, the purported members never authorized Kurtz or his attorneys, Robson and Bader, to object to the Offer. *See supra;* 4 B.R. at 68.

Further, Kurtz is not justified in receiving an allowance for reviewing Robson's drafts of papers which incorporated arguments concerning equitable subordination. The Bankruptcy Court held that:

It is difficult to perceive injury on the part of Subordinated Debentureholders who purchased their Debentures after the alleged misconduct of the Bank Claimants, the intervention of bankruptcy and at distressed prices.

It, therefore, appears that the doctrine of equitable subordination may not be asserted by persons such as Kurtz who purchased their claims against the bankrupt after the alleged misconduct of the Bank Claimants. 4 B.R. at 78.

Indeed, Mr. Kurtz testified that the average price he paid for a $1,000 face amount of debentures fell between $20 and $30. *Exhibit 46.* Lastly, Kurtz requests an award of $100,000 in compensation and $4,661.60 for disbursements, yet, provides neither time records nor other documentation.

In regard to the above, we hold that Kurtz failed to prove his entitlement to an allowance. For similar reasons, we hold that Applicant Kuntz, also a Subordinated Debenture Holder, should be denied his requested allowance of $8,000. Kuntz provides no indication in his Application, which is essentially a letter addressed to this court dated June 4, 1986, or in his summary statement as to the time expended by it in these proceedings. *Exhibit 30.* We are not convinced that the activities described in his Application, *inter alia,* "viewing video tapes" in Washington, D.C. had an impact on the formulation of the Amended Offer. Similarly, Kuntz' request for reimbursement of expenses was likewise deficient for it is based merely on approximations without a showing of a benefit to the Subordinated Debenture Holders.

■ We next consider the fee requests of Barnes of Howe, Barnes & Johnson. According to Barnes' affidavit, sworn to July 21, 1981, which is annexed to the Bader Application, Howe, Barnes and Johnson is a registered broker/dealer and member of various stock exchanges. Barnes states in his affidavit the he and Mr. Bader were *instrumental* in obtaining intervention by the Attorney Generals [sic] of the States of Illinois and Michigan, and ... [they] feel that the intervention of ... [such] public officials ... established extreme credibility in connection with the position of the public debenture holders, .... *See Exhibit* 13 (emphasis supplied).

In further support of the application, Mr. Bader submitted the affidavit of Alexander S. Randolph, sworn to August 17, 1981, which represents that he is the Chairman of the Board of Howe, Barnes. The affidavit states in pertinent part:

Had this firm not intervened in the matter, and had the objections been made merely by Mr. Bader's original clients, there would not have been a significant amount of bonds objecting to the settlement and the possibility of reversing the decision of Bankruptcy Judge Galgay in the matter would have been much reduced.

I therefore feel that our firm is entitled to the amount sought ... [by the application] which is respectfully requested. *See Exhibit* 28.

The mere act of seeking intervention by the Attorneys General without actively participating in the negotiation process for a settlement can hardly be deemed a basis in which to award fees. Moreover, Applicant asserts that it occupied itself by actively "protecting the interests" of its customers. *See Exhibit* 13. In fulfilling its tasks, Applicant traveled throughout the country just as Bader did, which in itself is indicative of duplicate services. *See supra.* Although Barnes believes that it is entitled to $15,000 in fees and $7,850.42 in expenses, it has reduced its aggregate request for fees and expenses to $10,000. We hold that such reduction is insufficient. Since Barnes was retained by Bader "in a non-contingent basis as a potential expert witness ...," *Exhibit* 13, he should look to Bader for its fees. We deny Applicant's application for Barnes' failure to convince this court that his services contributed to the formulation of the Amended Offer.

For similar reasons, we deny fees to Robert Browne, a limited partner of Bear Stearns & Company, Inc. Like Barnes, Browne was a potential expert witness retained by Bader "in a non-contingent basis as potential expert witness...." *Exhibit* 13. Neither Browne nor Barnes ever testified in any Grant proceeding. Browne requests reimbursement in an amount of $5,000 (an approximation) and supports this by an affidavit sworn to in July 1981. Applicant has failed to maintain time records or documentation of expenses. Like Barnes, Browne is seemingly attempting to justify his request on actions which purportedly added "credibility." *See supra.* Without more, actions involving the addition of "credibility" are non-compensable. Mr. Bader states:

> The undersigned [I. Walton Bader] submits that Mr. BROWNE rendered important services in connection with the present settlement in that his work in causing the joinder of approximately $19,000,000 in face amount of the * * * bonds in objecting to the original $.15 cent [sic] offer caused the objections to have "credibility" and, in fact, when Mr. BROWNE, in behalf of his clients, refused to accept the $.21 cent [sic] offer, this offer was immediately withdrawn by the creditor banks since ... [that] would prevent a 90% acceptance from being obtained. *Exhibit* 23.

It is interesting to note that Browne is seeking fees and expenses pursuant to the Amended Offer and yet he objected to such offer.

Next, we address the fee application submitted by Gordon, Peitzman & Lopes (The "Lopes Application") dated July 17, 1981. *Exhibit* 24. Lopes represented as counsel the following institutional Subordinated Debenture Holders: State of Michigan Employees Pension Trust; State of Illinois Teachers Pension Trust; State of Illinois Teachers Pension Fund; American United and Trust Co.; and Applicant Howe, Barnes & Johnson. Applicant requested a sum of $30,000 for 169.25 hours of rendered services and reimbursement for expenses of $3,076.83, aggregating to a total $33,076.83. This compensation requested is based on a rate of 177.25 per hour. Lopes disclosed in its Application the fact that it had already received $11,191.88 on account of the rendered service. Thereafter, in its supplemental application, Applicant reduced the aggregate requested amount by $11,191.88. *See Exhibit* 25. Thus, by reason of such payment Lopes presently seeks an allowance of $22,164. *Id.* In its supplemental application, Applicant details its activities in regard to services it successfully rendered in conjunction with the Original Offer. Unfortunately, we are unable to ascertain from the overly broad "time transcript" entries what sum is attributable to compensation for legal services or expenses. Examples of such entries include "telephone call Marshall Barnes" on 5–30–79, "letter to debenture holders" on 6–16–79, "Review Mort Robson letter; letter to Marshall Barnes" on 7–17–79. *Exhibit* 24. Consequently, we believe that Applicant was already adequately compensated for the above services by virtue of the $11,191.88 payment. Thus, its present request for $22,164 is hereby denied.

■ Next, we consider the reasonableness of Applicant U.S. Trust's request for compensation and expenses. We begin by noting that § 62 and § 64 of the Act fail to explicitly provide for an allowance of compensation and expenses to an indenture trustee and its counsel. The sole provision under the Act which does contemplate such allowance is § 242 of the Act. Pursuant to said section, an allowance may be for "proper costs and expenses incurred in connection with the administration of an estate...." Section 242 of the Act.

We recognize that the above section has traditionally been limited exclusively to Chapter X proceedings. *See In re Merchants and Manufacturers, Inc.*, 597 F.2d 348, 349 (2d Cir.1979). In *In re Fas International Inc.*, 382 F.Supp. 77 (S.D.N.Y. 1974), *aff'd per curiam* 511 F.2d 1164 (2d Cir.1975), *cert. denied* 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975), a Chapter XI proceeding, it was held that a bankruptcy court cannot exercise its equity powers to grant a fee allowance to an indenture trust-

ee without a statutory basis. 382 F.Supp. at 79. In that case counsel for the indenture trustee successfully asserted that the subordination clauses in the indentures should not be given effect because of certain ambiguities in its language. As a result of the indenture trustee's efforts, the subordinated debentures were recognized as a class. 382 F.Supp. at 78. Nevertheless, in denying the indenture trustee's application for fees and compensation the *Fas* court held that "since Congress has decided who may be reimbursed and compensated, an equity court may not enlarge upon legislation which is both an expression of policy and unambiguous." 382 F.Supp. at 81.

Similarly, in *In re United Merchants and Manufacturers, Inc.,* 597 F.2d 348 (2d Cir.1979), a case filed under Chapter XI, the Second Circuit held that a bankruptcy court "cannot exercise its equity powers to grant compensation and reimbursement to an indenture trustee." *Id.* at 349. The indenture trustee in *Merchants* based their applications on covenants in two indentures under which the debtor had agreed to pay the indenture trustee's reasonable compensation and reimbursement for expenses. According to the court "a chapter XI debtor is not free to contract to compensate persons when their compensation is not contemplated by the Act." *Id.* at 349. *See also Lane v. Haytian Corp.,* 117 F.2d 216, 219 (2d Cir.1941), *cert. denied,* 313 U.S. 580, 61 S.Ct. 1101, 85 L.Ed. 1537 (1941).

Notwithstanding the Amended Offer as approved by Galgay B.J., we reiterate that the lack of statutory authority would ordinarily preclude judicial consideration of fee applications submitted by U.S. Trust as well as those submitted by other Applicants despite contractual provisions to the contrary. 597 F.2d at 349. However, because of factual circumstances at issue, *supra,* we may be guided by case law addressing the applicability of § 242 of the Act.

In *Matter of Multiponics Inc.,* a Chapter X proceeding, the court held that even where there is a statutory provision, such as § 242 of the Act, providing for an allowance to indenture trustee and its counsel, said provision does not automatically give applicants *carte blanche.* 436 F.Supp. 1072, 1076 (E.D.La.1977).

Rather, the activities must clearly be beneficial to the estate. *Id.* at 1076. Conversely, services that are solely or primarily for the benefit of a client are not proper costs of the estate. *Id.* Although the indenture trustee in *Multiponics* had fulfilled its statutory duties under the Trust Indenture Act of 1939, the court in *Multiponics* refused to award compensation for the services of Citibank, as indenture trustee, and its counsel for such services involved routine monitoring functions and advice to debenture holders. According to the court, "these services to debenture holders are services for which the issuer contracted but it does not follow that they are to be paid for by the estate of the debtor." 436 F.Supp. at 1077.

More specifically the court recognized that the "indenture trustee alone determines what shall be done and how much of it is required" as no application is made to the court for advance approval. 436 F.Supp. at 1077. According to the *Multiponics* court, the indenture trustee does whatever it deems necessary to protect the debenture holders. Whether and to what extent it should be paid is a matter between it and the debenture holders. 436 F.Supp. at 1077.

Consequently, the *Multiponics* court, *supra,* awarded compensation only for those activities that were clearly beneficial to the estate. This included compensation for Citibank's active investigation of pre-petition activities of corporate insiders in that such investigation provided the reorganization Trustee with a basis upon which to bring action against such individuals. As a result of Citibank's rigor, the claims of two insiders were subordinated to the debenture holders and trade creditors. Although the court awarded fees for local counsel attending proceedings in New Orleans, it failed to award monies attributable to fees charged by Citibank's New York counsel who attended such proceedings. Such denial was based on Citibank's failure to minimize its costs by requiring both its local

counsel and its New York counsel to participate in the proceedings. According to the court, in an effort to satisfy its duties as indenture trustee, Citibank "rendered services far beyond" that which benefited the estate. 436 F.Supp. at 1075; *see also In re Saroca*, 46 B.R. at 533 (denial of attorneys' fees incurred for the sole benefit of an interested shareholder instead of the estate). In its determination, the *Multiponics* court also took note of the well-settled rule that services held to be duplicative of the trustee's efforts are non-compensable and unnecessary. *Multiponics*, 436 F.Supp. at 1076; *see also Dickinson Industrial Site v. Cowan*, 309 U.S. 382, 60 S.Ct. 595, 84 L.Ed. 819 (1940); *In re Porto Rican*, 117 F.2d at 599.

In summary, fulfillment of an indenture trustee's duties are compensable if they clearly benefit the estate and are non-duplicative. Conversely, if the duties are "routine or to the extent not routine of no quantitative or qualitative value" to the estate, then allowance of fees for services rendered by an indenture trustee and its counsel will be denied. *See In re Revere Copper and Brass, Inc.*, 60 B.R. 892, 896 (Bankr.S.D.N.Y.1986).

In the case before us, U.S. Trust seeks compensation and reimbursement of expenses in the amount of $1,104,086.19. Of the aggregate fee, $848,356.19 is for services rendered by Whitman & Ransom, U.S. Trust's counsel. The remainder of such is for services rendered by U.S. Trust. *Exhibit* 42. U.S. Trust asserts that it performed "its duties in a manner which it believed was consistent with the duties that a conscientious indenture trustee was obligated to perform." *Exhibit* 42. As we have already noted above, the mere fact that an indenture trustee fulfilled its obligated duties does not automatically entitle it to a fee allowance. There must be a true benefit to the estate and, to reiterate, a determination as to whether there was a benefit is limited by the parameters of the Amended Offer as approved, *supra.* Consequently, those services that were rendered prior to the negotiations of the Original Offer, *supra,* and those rendered subsequent to the approval of the Amended

Offer on June 23, 1981 will be deemed non-compensable despite any contractual covenants to the contrary and despite the fact that U.S. Trust fulfilled its statutory duties under the Trust Indenture Act of 1939. *Supra; see also In re United Merchants and Manufacturers, Inc.*, 597 F.2d at 348.

In fact, if we were to assume the validity of U.S. Trust's assertion that the Amended Offer was actually not an improvement over the Original Offer, *supra,* then it should immediately follow that all services rendered subsequent to the approval of the Original Offer in February 20, 1980 are deemed non-compensable. Nevertheless, we have chosen to consider those services rendered between the period of February 20, 1980 to June 23, 1981. Consequently, in terms of fees for services rendered and disbursements incurred by Whitman & Ransom during the period from October 1, 1975 to February 28, 1978, we immediately deny an allowance for $458,442.14. *Exhibit* 42.

Before we determine which of the rendered services for which Applicant seeks fees are compensable, we note that U.S. Trust's Application is comprised of a narrative and schedule referred to as "Exhibit A" which lists the services rendered by Whitman & Ransom in accordance with the year in which they were performed. *Exhibit* 42. Exhibit A fails to include the precise day and month in which such services were rendered and fails to specify the length of time attributable to such service. *Id.* Whitman & Ransom, however, has submitted a computerized time record, the entries of which were recorded daily and indeed specify the length of time attributable to each service. *Exhibit* 73A. Nonetheless, such entries are overly broad and must, therefore, be read in conjunction with Exhibit A, *supra.* In spite of the overly broad nature of the entries, however, the key factors distinguishing this Applicant from the other attorney-Applicants is the fact that U.S. Trust was the only Applicant to participate in the negotiation of the Original Offer and its services

were indeed commended by J. Galgay, *supra,* and other Applicants.

Applicant Brewer, for instance, testified to the following: "I don't think there is any doubt that U.S. Trust made a substantial contribution or that there were significant aspects of its labors that contributed to bondholders. They certainly contributed within the scope of Judge Galgay's order by negotiating the fifteen-percent offer." September 16, 1987, T. 143.

Seemingly, the beneficial nature of services rendered by Whitman & Ransom, as counsel to U.S. Trust, are uncontroverted. Accordingly, we must determine the extent in which Whitman & Ransom's services are compensable. Beginning with services rendered between March 1, 1978 and February 28, 1979, as noted in Exhibit A, for which $168,774.90 in fees and $6,889.86 in expenses is sought, we note that the vast majority of services are unrelated to the Original Offer. The only services that seemingly have some relation to the Original Offer include the initiation and pursuit of settlement discussions with counsel to the Banks directed at having the Banks agree to allow the Trustee to make an offer of settlement to the holders. *See Exhibit* 42. Although such services were rendered from approximately the summer of 1978 continuing through the fall of 1978, *Exhibit* 44, we are unable to ascertain the exact date and length of time attributable to said activities. Accordingly, we will consider these services generally as part of our determination in granting an allowance.

Next to be considered are the services rendered between March 1, 1979 to January 31, 1980 for which fees of $120,053.40 and $6,312.72 in expenses are sought. Unlike the services rendered from March 1, 1978 to February 28, 1979, the majority of services rendered during March 1, 1979 to January 31, 1980 are to some extent related to the Original Offer. These included, *inter alia,* "continued pursuit of settlement discussions with counsel to the Banks directed at having the Banks agree to allow the Trustee to make an offer" and "attention to drafting and redrafting with the

aforesaid counsel all the documents necessary to effectuate the Compromise and Settlement once approved by the Bankruptcy Court." *Exhibit* 42. A less significant amount of time for the above period is attributable to services which are unrelated to the Original Offer such as the "analysis and legal research ... of action ... naming U.S. Trust as successor indenture trustee, as a nominal defendant...." *Exhibit* 42. Such services are non-compensable as they were rendered to benefit the Applicant or its constituency, not the estate.

Lastly, in considering those services that were rendered subsequent to the approval of the Original Offer from February 1, 1980 through July 31, 1981, for which a sum of $87,883.17 in fees and expenses are sought, we note that U.S. Trust through its attorneys aligned itself with the Trustee and Bank Claimants who were attempting to convince the Attorneys General for the States of Illinois and Michigan and the Kurtz Objectants lead by Bader, Brewer and Robson to agree to settlement. Consequently, U.S. Trust seeks fees for services which were adequately being rendered by the Trustee. *See Sapphire.* U.S. Trust has neither demonstrated to the court that the services of its attorneys were not duplicative of those rendered by the Trustee and the Bank Claimants nor that the Trustee was ineffectual in the rendition of its services. Consequently said Applicant is precluded from receiving fees and expenses for the above period. *Exhibit* 42.

In determining the reasonableness of fees requested in said Application, we will again implement the use of the *Johnson* Factors, *supra.* U.S. Trust was the only Applicant before this court to address the *Johnson* Factors, asserting that the time involved was lengthy due to the difficult negotiations leading to the Original Offer (*Johnson* Factors 1, 8); that the case was difficult as it was one of the largest bankruptcy cases commenced and involved intricate issues, (*Johnson* Factor 2); that U.S. Trust and its counsel were especially well-qualified because of experience in other major bankruptcy cases including, *In re Equity Funding Corporation of America,* 492 F.2d 793 (9th Cir.), *cert. denied,* 419

U.S. 964, 95 S.Ct. 224, 43 L.Ed.2d 178 (1974) (*Johnson* Factors 3, 9); that Whitman & Ransom were precluded from other employment (*Johnson* Factor 4); that Whitman & Ransom charged its customary rate at approximately $83 per hour without a request for a premium (*Johnson* Factor 5); that U.S. Trust has not been compensated for fees and expenses charged by Whitman & Ransom (*Johnson* Factor 6); that Whitman & Ransom spent time with litigated matters that entailed prolonged and concentrated efforts (Johnson Factor 7); that through negotiations and litigation, Whitman & Ransom contributed to the reaching of the Original Offer (*Johnson* Factor 8); that the case was undesirable because of the subordinated position of the Subordinated Debenture Holders (*Johnson* Factor 10); and that the hourly rates awarded in district courts have been higher than those sought in this case (*Johnson* Factor 12). *Exhibit* 44.

Considering the role of Whitman & Ransom, we do not dispute the above. Nevertheless, because of the lack of detail in its time sheets, *Exhibit* 73A, and in its Application, *Exhibit* 42, along with indications that some of the services conducted during the negotiation stage of the Original Offer primarily benefited its constituency and not the estate, we are prevented from awarding the full amount of the requested fees for the time period specifically between March 1, 1979 and January 31, 1980. Although we agree with Applicant Brewer's suggestion that U.S. Trust's requested fees should be reduced, we will not go so far as to reduce such fees by his suggested forty-percent. *See* September 16, 1987. T. 142. Instead we deem it appropriate to award U.S. Trust 90% of its fees for the above applicable period. Since we have determined that the applicable period is from March 1, 1979 to January 31, 1980, we award $108,048.06 for fees and $5,681.45 in expenses plus additional fees of $40,500 and expenses of $1,500 attributable to initial negotiations rendered sometime between the summer of 1978 and the fall of 1978. *Exhibit* 44.

In terms of the U.S. Trust's request for $250,000 fees and compensation on behalf of itself, we hold that our discussion addressing the Applications for fees and expenses submitted by Applicants Kurtz, Kuntz, Barnes and Browne, *supra*, is applicable to U.S. Trust's request for fees for several reasons. Firstly, we note that U.S. Trust is not an attorney and thus is precluded from relief under § 62 of the Act. Further, U.S. Trust's services do not coincide with those services provided for under § 64 of the Act, and thus it is precluded from seeking relief under said section. Further, U.S. Trust failed to maintain time records which makes it difficult for this court to ascertain with enough particularity whether such services contributed to the formulation of the Original Offer or Amended Offer and when in fact such services were rendered and the length of time attributable to such services. Next we hold that even if U.S. Trust's services were particularlized and were indeed related to the formulation of the Original Offer, we would nevertheless preclude said Applicant from recovering monies from the estate since its attorneys, Whitman & Ransom, were already acting on behalf of U.S. Trust and, therefore, such award to U.S. Trust would be for duplicative services. *See Sapphire*, 509 F.2d at 1246. We reemphasize that the fact that such services were required of U.S. Trust under the Trust Indenture Act of 1939, *supra*, does not in and of itself justify an allowance of fees and expenses. Further, an award of such fees would be prejudicial to other non-attorneys who were denied such fees and thus it would be violative of the principle of maintaining equality of treatment to *all* creditors. *Supra*.

■ Lastly we consider the fee requests by Attorneys General for the States of Illinois and Michigan. The Attorneys General for the States of Illinois and Michigan are distinguishable from the other attorney-Applicants discussed thus far for two reasons. First we note that there is no issue as to the retention of the Attorneys General to act on behalf of their respective clients. *See Johnson* Factor 11. In terms of retention, the Attorney General for Illinois, for instance, represented the State of

Illinois Teachers Retirement System which held Subordinated Debentures with a face value of $3.168 million. Similarly, the Attorney General of Michigan represents the State of Michigan which, through its State Treasurer, acting as Trustee for various employee pension and retirement funds, purchased Subordinated Debentures having a face value of $5.2 million. The Illinois and Michigan Attorneys General were first consulted by their respective clients in June, 1980.

Second, we note that the beneficence of the services rendered by the Attorneys General in contributing to the formulation of the Amended Offer was well-recognized by other Applicants. In recognizing the contribution, Applicant Barnes asserted in his affidavit that "the intervention of these public officials, who have no individual 'axe to grind,' established extreme credibility in connection with the position of the public debenture holders, and that the intervention of the States Attorney Generals [sic] was responsible in a great measure for the successful negotiations, with the banks, resulting in the present offer." *Exhibit* 13. Similarly, Applicant Brewer asserted in his application for fees and expenses, that:

"... the appearance of those two attorneys general in this case was the evident cause for the bankruptcy court to arrange with the appellate district judge (Judge Conner) and the Chief Judge of the District Court for the appellate proceedings to be remanded to the bankruptcy court for the purpose of conducting new settlement conferences the main purpose of which turned out to be for the banks and the bankruptcy court to find out what the amount of an amended offer would have to be in order for the Attorneys General of Michigan and Illinois to accept the offer and withdraw their opposition to the 15% offer." *Exhibit* 19.

Furthermore, Brewer asserted:

"In short, the position taken by the two states was the main factor in determining the amount of the amended offer by the banks. Thus, the importance of intervention by the two attorneys general

to achievement of the 21% amended offer is unquestionable." *Exhibit* 19.

Similarly in their Joint Application for allowances of fees and expenses, both Attorneys General assert that they were "instrumental in successfully reviving settlement negotiations (which had otherwise stalled) between the bank lending committee and various objectants," that their participation enabled them "to address the relevant factual and legal issues thereby strengthening Applicants' position ... that the several objectants, led by Attorneys Morton F. Robson, Bradley R. Brewer and I. Walton Bader, should decrease their respective demands" to enable a "mutually acceptable settlement," and that said Applicants encouraged Objectants to reduce their demands, to approve the bank lending committee's Amended Offer, and to withdraw their appeal commenced in the United States District Court.... *Exhibits* 3 and 11. These actions taken by the Attorneys General in encouraging the Objectants lead by Brewer, Bader and Robson were based, *inter alia,* on the realization that there would be a certain "point at which the banks would prefer to litigate than give up more in settlement." *See In re W.T. Grant,* 699 F.2d at 607.

In regard to the above, the efforts of the Attorneys General were earnest and clearly contributed to the formulation of the Amended Offer. To reemphasize, notwithstanding the appeals taken by Brewer, *supra,* the Subordinated Debenture Holders would have recovered their share following the approval of the Amended Offer.

In considering the fee requests of the Attorneys General for the states of Illinois and Michigan, we note that said Applicants first submitted a joint application dated July 29, 1981 seeking an aggregate sum of $250,000. Of that amount $9,778.77 represented expenses for which reimbursement was sought. *Exhibit* 3. Thereafter, said Applicants filed separate Supplemental Applications. The Michigan Attorney General in its supplemental application dated June 19, 1986, seeks fees of $104,805 for a total of 510 hours of services and reimbursement of $2,740.23 in disbursements. *Ex-*

*hibits* 5, 7. The Illinois Attorney General in its Supplemental Application dated June 13, 1986 seeks compensation of $135,370 for 743.5 hours of services and reimbursement of $7,038.54 of disbursement. *Exhibit* 6. In the aggregate, such requests amount to $249,953.77.

In determining the reasonableness of such requests we immediately recognize that just as an indenture trustee must satisfy its fiduciary duties to its constituency, an Attorney General must satisfy his fiduciary duties to the state. Nevertheless, fulfillment of such duty in and of itself does not necessary entitle an applicant to its requested allowance of fees and expenses. *Supra.* Thus, we reemphasize that services that are compensable are those that benefit the entire estate as opposed to being primarily for the benefit of the Applicant's clients. *Supra.* In our determination, we refer to the *Johnson* Factors as a framework for determining the reasonableness of the fee request. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714.

When considering Factor 1 of the *Johnson* Factors we note that a substantial number of hours were spent by both the Attorneys General for Michigan and Illinois during a period of time of less than one year. A significant portion of these hours, however, may be attributable to duplicative services. In reviewing the reconstructed time records of the Illinois Attorney General, for instance, we note that on January 28, 1981, Barbara Fritsche, John Brunsman and Cosby *all* attended hearings before Judge Galgay and charged a total of 87 hours to the case. *Exhibit* 11. Another example of duplicative efforts of the various attorneys in the Illinois Attorney General's office is for research on the issue of whether the State of Illinois should "intervene in state court action with intent to litigate breach of fiduciary duty questions against banks" or in federal court. Attorney Fritsche attributed 110 hours to such research and Attorney Brunsman attributed 80 hours to such research. Furthermore, it is questionable whether such research as to the various strategy paths is indeed compensable. *See In re St. Pierre,*

*supra.* Annexed to the Illinois Attorney General's application for fees and expenses is a voluminous listing of telephone rentals, toll calls, and travel receipts. *Exhibit* 11. Although some of the telephone calls and trips to New York and Chicago may have been necessary for the purpose of meeting and negotiating with other creditors of Grant, it is questionable whether *all* the trips and telephone calls were necessary and if the Illinois Attorney General's office made any effort to minimize costs. The issue of cost minimization and duplication of services is also applicable to the Michigan Attorney General. *Exhibit* 4.

In addition, the Michigan Attorney General seeks disbursements of $858.61 for travel expenses that were incurred during the years of 1978 and 1979. This in and of itself is curious since the Michigan Attorney General's office first became active in the case in June 1980. *Exhibit* 7, ¶ 3. Further, the Michigan Attorney General's office failed to submit a detailed time record of its services. Nevertheless, since there were *three* attorneys in the Michigan Attorney General's Office who were involved in this case it is seemingly unlikely that there was not duplication. Furthermore, we note that both Attorneys General for the States of Michigan and Illinois seek fees for appearances in adversary proceedings in New York, *inter alia, Lewy v. Chase Manhattan Bank* Index 79 A.D.2d 928, 437 N.Y.S.2d 263 (1981), an action brought against three banks' alleged breach of fiduciary duty. The Applicants have not demonstrated to this court the significance of their appearances in the *Lewy* proceeding as it related to the formulation of the Amended Offer. Seemingly, such appearances are non-compensatory as they were primarily for the benefit of their clients and not the estate.

In terms of *Johnson* Factors 2, 3, 7, 8, 9, 10, we recognize that Illinois and Michigan Attorneys General were placed in a difficult position as they first had to review different strategies and then had to assess the probabilities of success of such actions and decide whether they shall join the Kurtz Objectants in support of the appeal

with respect to the Original Offer. *Exhibit 42.* Once they engaged in negotiations with the Bank Claimants and the Trustee, explored theories that could be used against the Bank Claimants, i.e., equitable subordination, determined that such theories were not convincing and that further assertion of such theories would act to prolong the litigation process, they then had to convince the other Objectants, Bader, Brewer and Robson, of the same in order to obtain the acquiescence of 90% of the Subordinated Debenture Holders as required by the Bank Claimants. *Exhibit 12.* The objections raised by Bader, Robson and Brewer undoubtedly made this case undesirable. We believe that great skill was necessary to perform these legal services especially under the strict time limitations illustrated in this case and we are satisfied that the attorneys in the Illinois and Michigan Attorney Generals office were indeed experienced and able.

Lastly, we address the hourly rates Applicants charged for their services. *See Johnson* Factors 5, 6, 12. The hourly rate requested by the Office of the Attorney General for Michigan is $205.50. The above Applicant is unaware of a grant of fees in a case similar to these proceedings. The hourly rate requested by the Office of the Attorney General for Illinois is an average of $182. The above Applicant is also unaware of a grant of fees in a case similar to these proceedings.

■ We nevertheless hold that the above Applicants are not precluded from the receipt of an allowance of fees and expenses. We are also unconvinced that the Attorneys General for both states should be denied fees because they are tax supported entities and thus not dependent upon fees to sustain its existence. *See State of Illinois v. Sangamo Construction Company,* 657 F.2d 855 (7th Cir.1981); *see Exhibit* 53.

Although we are convinced that the Attorneys General may be the recipients of fees and expenses, in light of the above discussion we adjust the amounts sought in their Applications thereby reducing the requested fees and expenses by forty-percent (40%). Consequently, we award $62,883 in fees and $1,644.14 in expenses to the Attorney General of Michigan and $81,222 in fees and $4,223.12 in expenses to the Attorney General of Illinois.

## CONCLUSION

For the foregoing reasons, an allowance is granted to U.S. Trust in the aggregate amount of $148,548.06 in fees and $7,181.45 in expenses, to the Attorney General of Illinois in an amount of $81,222 in fees and $4,223.12 in expenses and to the Attorney General of Michigan in the sum of $62,883 in fees and $1,644.14 in expenses. All other Applications for fees and expenses are hereby denied.

The attorneys for the Trustee of Grant are directed to settle an Order in accordance with this determination.